**CENTRAL MERCEDITA, INC.,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent.

No. 5678.

United States Court of Appeals
First Circuit.

April 13, 1961.

Orlando J. Antonsanti, San Juan, P. R., for petitioner.

Melvin J. Welles, Attorney, Washington, D. C., with whom Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Elizabeth W. Weston, Attorney, Washington, D. C., on brief, for respondent.

Before WOODBURY, Chief Judge, and MAGRUDER * and HARTIGAN, Circuit Judges.

* Sitting by designation.

HARTIGAN, Circuit Judge.

This is a petition to review and set aside a decision and order of the National Labor Relations Board, 126 N.L.R.B. No. 158, issued March 25, 1960 and a cross petition by the Board for enforcement of its order. This court previously denied the Board's petition for the summary entry of a decree enforcing its order of June 2, 1959, N.L.R.B. v. Central Mercedita, Inc., 1 Cir., 1959, 273 F. 2d 370. The 1959 order was vacated by the Board, and consideration was given to the entire record, including the Intermediate Report of the trial examiner, the exceptions and the brief. The Board in its 1960 decision adopted the findings, conclusions and recommendations of the trial examiner.

The trial examiner made the following findings of fact. Hamilton William Thillet was discharged by Central Mercedita, Inc., the respondent below, (hereinafter called Mercedita) on February 17, 1958. Thillet at the time was an accounting machine operator in the payroll and tax department of Mercedita. In December 1957 or early January 1958 employee Felix Lugo Borrero started a movement to form a social club for all white-collar employees of Mercedita. Thillet signed the paper being circulated but, from the beginning, expressed the view that the club should be a union rather than a social organization. One Saturday about January 16, 1958, the group interested held its first meeting. After several meetings at which Thillet championed the idea of forming a union, this view was adopted by the group. Subsequent to overhearing a conversation in the office of Marcial Hernandez, the cashier of Mercedita, Epifano Torres, the chief of the payroll and tax section, warned Thillet to stop his union activities because the directors of Mercedita knew about them and Thillet had been accused of being the leader of the movement. Thillet was not deterred from his purpose. On February 11 Marcial Hernandez called Thillet to his office and told Thillet he had heard rumors of a union being organized and of the accusation of Thillet being the leader. Thillet admitted the truth of the rumors. Hernandez warned Thillet that he should be careful as the respondent did not like to have its employees organize.

Thillet had an enlargement of a picture of his children in his hand during the interview. Hernandez complimented Thillet on his handsome children. During the course of the conversation Thillet remarked that he would give his life for his children. Hernandez at that time did not think that Thillet was threatening him in any way. On that afternoon, however, Hernandez called Thillet back to his office and asked Thillet if there were any second intention in Thillet's remark of "giving his life for his children." Thillet denied any ulterior meaning. Hernandez pressed him again for "the truth" and Thillet said that someone had told him that Hernandez had gone to directors of Mercedita several times saying bad things about him. Hernandez denied having done this and wanted to know who told that to Thillet. Thillet refused to disclose his informant and Hernandez threatened, "if you do not tell me the person who said such a thing I am going right now to see the directors of the Company, the administrator, and I will let them know this because this is a threat, I think."

On the following day Hernandez repeated to several officers of Mercedita his conversation with Thillet. Hernandez also related the incident to his brother, Jose, who advised him to report the matter to the district attorney. On February 13 Marcial Hernandez went to the district attorney and related his story. When the district attorney asked if Hernandez wanted to do anything against Thillet now, Hernandez replied "no", he just wanted "to inform you what happened."

On February 14 Mercedita's general manager, Osvaldo de Aragon, having received a written report of the incident from Marcial Hernandez called Thillet to his office. There Aragon told Thillet that Hernandez had complained of Thillet's threat to kill him and read Hernan-

dez' report to Thillet. Thillet denied having made any such threat. Aragon spoke of an incident in 1955 in which Thillet had assaulted a fellow employee, Cepero, and an incident between Thillet and Jose Hernandez in 1957. Aragon stated that because of these incidents, he was forced to demand Thillet's resignation. Thillet refused to resign and stated that Mercedita was asking for his resignation because of his union activities. Marcial Hernandez was sent for and he repeated the accusation concerning the February 11 incident which Thillet again denied. Aragon, Tormes, Mercedita's attorney, and Rivera Martinez, Thillet's superior, tried to convince Thillet to resign, offering three or four months' severance pay and a good letter of recommendation if he would resign. Thillet refused. Aragon at the end of the meeting told Thillet to go home and think the matter over.

On several occasions following this meeting, Thillet's superiors urged him to take the offer and resign, and even increased the offer to $1,000 severance pay and made offers of personal aid in procuring another job. On February 17 Rivera Martinez asked Thillet for his decision. When Thillet said he would not resign, Rivera Martinez told him that he was discharged.

In regard to Mercedita's explanation of Thillet's discharge, i. e., that he was a dangerous, belligerent employee who had threatened three superiors, the trial examiner found: (1) that Thillet had been the aggressor in the 1955 incident with Cepero, but had been returned to work without reduction in salary, after a reprimand to learn to take teasing; (2) that Thillet was not shown by the record to have been the aggressor in the 1957 incidents involving Jose Hernandez, and since Thillet was given a $12.50 per month increase shortly thereafter, Mercedita appeared to have given no great significance to these incidents at that time; (3) that the incident with Marcial Hernandez had been blown up for the purpose of providing an excuse to discharge Thillet; (4) that Hernandez' ac-

tions belied his claim that his life had been threatened, and that Hernandez did not threaten to report the alleged threat by Thillet until Hernandez had been unable to make Thillet reveal who was his informant about Hernandez' discrediting of Thillet to the directors of Mercedita. The trial examiner concluded that Thillet had made no threats against Hernandez, and the claimed incidents were not the reason for Thillet's discharge.

The trial examiner concluded that the reason for Thillet's discharge was his union activities and his refusal to abandon them and that this constituted a violation of Section 8(a) (3) and (1) of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 158(a) (1), (3). The examiner also concluded that conversations of various supervisors with Thillet and with two other employees constituted attempts to coerce its employees in violation of Section 8(a) (1) of the Act, 29 U.S.C.A. § 158(a) (1).

The examiner's recommendations, adopted by the Board, were that Mercedita be ordered to cease and desist (1) from "discouraging membership in a white collar union, or in any other labor organization of its employees" by discharging any of its employees because of their activities on behalf of such labor organization, and (2) from "in any manner interfering with, restraining, or coercing its employees in the exercise of their right of self-organization," etc. The examiner also recommended that Thillet be offered reinstatement and made whole, and that appropriate notices be posted.

Mercedita contends that the findings of the Board are not supported by substantial evidence and that they were biased, capricious and arbitrary. It points out many specific findings of the trial examiner and then refers to particular testimony as being insufficient to support the findings. In general, the testimony that Mercedita refers this court to is insufficient alone to support the findings of the trial examiner, and makes the trial examiner's statement seem founded on some imagining, at least. However, upon a very careful ex-

amination of the whole record, there is testimony other than that referred to by Mercedita that affords substantial basis for the trial examiner's findings.

For example, Mercedita claims that the trial examiner clearly erred when he concluded that "the exact date of the Cepero incident is indefinite in the record." Mercedita refers us to Thillet's testimony that fixes the date as "in September 1955". However, close examination of the record indicates that Thillet also testified that he received *four* pay increases following the Cepero incident, and the only four increases disclosed by the record include one of August 1, 1955. In many other of Mercedita's contentions about specific findings of the trial examiner, it has overlooked the portions of the record that provide substantial basis for the trial examiner's findings. From our examination of the testimony and the intermediate report we believe that the trial examiner gave full and careful consideration to all of the testimony of the various witnesses, and that he was not biased or capricious in any way.[1] We are satisfied that there is substantial evidence in the record considered as a whole to support the findings made by the trial examiner and adopted by the Board.

 In its petition for enforcement, the Board urges that its order is not too broad and should be enforced in its entirety. The order enjoins Mercedita from discouraging membership in a white-collar union, "or any other labor organization of its employees" and from "in any manner interfering with, restraining, or coercing its employees." Since the contention of Mercedita has been that proper organization of the workers involved in the movement which is the background of this case would require several differ-

ent units, we believe that there is substantial basis for the Board's inclusion of the "any other labor organization" phrase. We believe also that the record as a whole provides sufficient basis for the Board's inclusion of "in any manner," since there is evidence of Mercedita's threat of reprisals, offer of rewards, and discriminatory discharge of an employee in an effort to restrain employees in the exercise of their rights of self-organization.

A decree will be entered enforcing the order of the Board and dismissing the petition to review and set aside the order.

---

1. One manifest misinterpretation of the testimony was made by the trial examiner in his finding that at the meeting of February 14, Attorney Tormes stated that it was all right to form a club but not to form a union. The testimony concerning that meeting was that Tormes said "you can form a union and a club, that is not forbidden." This finding, however, was a subsidiary one in the narration of the events, and does not, in our opinion, detract from the substantiality of the evidence supporting the trial examiner's finding of a discriminatory discharge, nor indicate bias on his part. See National Labor Relations Board v. Reed & Prince Mfg. Co., 1 Cir., 205 F.2d 131, 139, certiorari denied 1953, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391.