**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MAYRATH COMPANY, Respondent.**

**No. 13923.**

United States Court of Appeals
Seventh Circuit.

June 27, 1963.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., Atty., N. L. R. B., Washington, D. C., Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Judith Bleich Kahn, Atty., N. L. R. B., for petitioner.

Warren G. Sullivan, Don A. Banta, Chicago, Ill., for respondent; Naphin, Sullivan & Banta, Chicago, Ill., of counsel.

Before DUFFY and CASTLE, Circuit Judges, and MAJOR, Circuit Senior Judge.

DUFFY, Circuit Judge.

The National Labor Relations Board has petitioned this Court for the enforce-

ment of its order issued against respondent on August 31, 1961. The Board's decision and order are reported at 132 NLRB 1628. The respondent is engaged in the State of Illinois in the manufacture of corn and hay elevators and related products.

In his intermediate report issued August 5, 1960, the Trial Examiner found respondent had discriminatorily discharged twelve employees, and had discriminatorily reduced the wages of Wilbur Montavon prior to his discharge. Respondent filed exceptions, and thereafter the Board found that respondent had discriminatorily discharged ten employees thereby violating Section 8(a) (3) (1) of the Act. The Board also found respondent violated Section 8(a) (1) by interfering with, restraining and coercing its employees in the exercise of the rights guaranteed to them by Section 7 of the Act.

In the proceeding now before us, respondent has elected to contest only the findings of fact and conclusions of law of the Board which resulted in the holding that the discharges of employees Harold McGregor, Jesse Lynn Richards, Frank Marrisett and Max Wells were discriminatory, and also the conclusion that Elmer Barnes was not offered reinstatement to substantially equivalent employment.

In May 1958, some of the employees in respondent's plant which was unorganized, signed authorization cards for the United Automobile, Aircraft and Agricultural Implement Workers of America, AFL–CIO (Union). Several union meetings were held. At a meeting held on May 29th, union buttons were distributed and it was decided to wear these buttons to work the following day.

On May 30, a number of employees appeared for work wearing union buttons. Supervisor Claude Olson asked several employees the meaning of the buttons. Employee Cummings replied the employees were trying to organize a union. Olson then asked Cummings why the employees thought they needed a union.

Olson also noted that employee Woodrum was wearing a large union button. He asked him whether he was the "ringleader of the Union." Olson also said it was a "pretty shady deal" to try to bring the union into respondent's plant.

On the same day, Martin Mayrath, the president and treasurer of respondent, went through the plant speaking to employees who wore union buttons. He said to employee Wells, "Get that damn button off or go home." He spoke twice to employee McGregor, the second time asking where his union button was. McGregor replied it was on his hat, and Mayrath said "Get out now." Mayrath then asked supervisor Joe Sims to "find out what was going on."

Sims took a poll of the employees and after each employee's name in a notebook, he recorded such employee's feeling toward the union by marking a "U" next to the names of those who wore union buttons or who stated they were favorable to the union, and an "A" next to the names of those indicating they were against the union.

Sims stated to employee Elmer Barnes who was wearing a button, "I had put you in for a 20 cent raise but you won't get it wearing that damn badge. In fact, if you want to work here you had better take that damn thing away, get rid of it, throw it away."

To employee George West who was also wearing a union button, Sims said that if West wanted to work at respondent's plant he had "better take off the button." West thereafter removed his union button.

Mayrath continued to tour the plant and spoke to about thirteen to fifteen employees about union buttons. He asked a number to take off their buttons or else leave the plant. Some employees did remove the union buttons, but employees Elmer Barnes, Millard Cummings, Charles Tedder, Harold McGregor, Don Woodrum, John Siefkin and Robert Montovan refused to do so. Mayrath then either ordered them to go to the office and pick up their checks or

else told them directly that they were "fired."

A short time before employee Siefkin was fired and Siefkin refused to remove the union button as requested by Mayrath, the latter asked Siefkin whether he believed in unions. When Siefkin answered in the affirmative, Mayrath said unions had done some good but had their bad points like "politics and religion." When Mayrath requested Siefkin to reconsider, and Siefkin refused, Mayrath said he had "placed a trust in" Siefkin but the latter had "broken that trust" by joining the union. Mayrath concluded the conversation by saying "I am so mad right now I can't speak to you. You go home, and go home right now." Mayrath added that "No union, nobody was going to tell him how to run his business."

On the same day, Mayrath, in a conversation with employee Cummings, said he did not need a union to tell him how to run the business and he would have to ask Cummings to take off his button or leave. Cummings refused to remove his union button, and left.

On June 2, the next work day after respondent had discharged seven employees, respondent discharged employees Frank Marrisett, Lynn Richards and Max Wells.

On May 30, Sims spoke to Marrisett saying "I see you are wearing one of those buttons." Marrisett replied that he was, and added "I have an extra one, Joe, if you want one." Sims said that he "wasn't wearing the damn thing."

Then, on June 2, as Marrisett was about to start work, production manager Heikes said, " * * * I don't know if there is any use for you to start work, in other words you are fired." Marrisett said "Fired? What is the reason? * * * Is that over the Union?" Heikes answered, "That is exactly right." Heikes then turned to Richards and said "I guess you needn't turn yours on either. You are fired." When Richards asked if it were "over the same thing," Heikes answered in the affirmative.

We have quoted testimony as to the circumstances under which employees other than McGregor, Marrisett, Richards and Wells were terminated. Although the order of the Board is no longer contested as to such other employees, we cannot consider the issues left in the case in a vacuum. Pertinent is our statement in Sunshine Biscuits, Inc. v. National Labor Relations Board, 7 Cir., 274 F.2d 738, 741: "We do not think the evidence relating to * * * discharge can properly be considered in a vacuum, separate and apart from that relating to petitioner's anti-union attitude. * * * "

This is not the kind of case about which employers sometimes complain charging that the Board considers all witnesses on one side as worthy of credence while disbelieving all witnesses on the other. Here, the Board dismissed the complaint as to Robert Stevens, George West and Dallas West. The Board reversed the Trial Examiner's conclusion that Cecil Barnes and Wilbur Montavon had been discriminatorily discharged. The Board reversed the finding of the Trial Examiner with respect to the recommended reinstatement of Cummings, Woodrum, Montavan and Siefkin, concluding that each had been offered reinstatement to substantially equivalent employment.

■ Under the rights guaranteed by Section 7 of the Act, employees were entitled to wear union buttons as part of a concerted activity to assist the union. Republic Aviation Corp. v. National Labor Relations Board, 324 U.S. 793, 801–803, 65 S.Ct. 982, 89 L.Ed. 1372; National Labor Relations Board v. Essex Wire Corporation, 9 Cir., 245 F.2d 589, 593.

There is, of course, some limitation on this right. This Court, in Caterpillar Tractor Co. v. National Labor Relations Board, 7 Cir., 230 F.2d 357, 359, said that an employer's right to prohibit such organizational activity " * * * is limited to the restriction of activities which disrupt, or tend to disrupt, production and to break down employee discipline, and

does not include restriction of passive inoffensive advertisement of organizational aims and interests, i. e., the wearing of advertising insignia and buttons, which in no way interferes with discipline or efficient production[1]. * * *"

■ Respondent attempts to justify its May 30th prohibition of wearing union buttons on the ground production was interfered with, but we do not think the record supports this contention. While production may have been interfered with to some extent on May 30th, it undoubtedly resulted from the activities of supervisor Sims who polled every employee as to his union views; and by the fact that supervisor Olson went through the plant asking questions about the union, and by president Mayrath who stopped numerous employees from working and demanding that they remove the union buttons they were wearing.

■ We consider first the discharge of Harold McGregor. Respondent, relying on testimony of Mayrath, says McGregor deserved to be strongly reprimanded or discharged for his poor bundling of chains on the morning of May 30th and again on the afternoon of that date. We have here a sharp conflict in the testimony of Mayrath and McGregor. We have heretofore quoted McGregor's version of what was said. The Trial Examiner credited McGregor and refused to credit Mayrath. It was the Trial Examiner who "observed the witnesses and lived with the case." Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 496, 71 S.Ct. 456, 468–469, 95 L.Ed. 456. The credibility to be accorded the testimony was clearly a matter for the trier of the facts. Even if McGregor were properly the subject of reprimand, yet it was McGregor's display of the union button which was the "motivating factor which resulted in his discharge," then the incident of the poor

work in the chain house on May 30 is no defense. Sunshine Biscuits, Inc. v. National Labor Relations Board, 7 Cir., 274 F.2d 738, 742 and cases cited therein.

### MARRISETT AND RICHARDS.

■ Respondent contends Richards was discharged because he was loafing and that Marrisett was discharged because he was a poor worker.[2] We have heretofore quoted testimony as to what production manager Heikes gave as the reason for the discharge. It was over the union. Heikes was admittedly a supervisor, and his statement made at the time of effectuating the discharge must be considered an admission by respondent. True, there was again conflicting testimony as to the reason for these two discharges, but there is sufficient credible evidence to sustain the finding of the trier of the facts on this point.

### MAX WELLS.

The discharge of Max Wells presents a different situation. If it had occurred at a time other than when a number of employees were discharged for union activities, it is doubtful that any argument would be presented that his discharge was discriminatory.

■ Wells was a probationary employee who had been hired on May 26, 1958. He had not previously performed any work comparable to that available at respondent's plant. Because of Mayrath's personal acquaintance with Wells' brother, it was decided to try him on several jobs. He was tried on riveting sprockets, but he had a nervous condition causing his hands to shake so that he could not safely handle the riveting machine in the chain shack. He was tried on a drill press and also helping a spot welder, but he showed a lack of aptitude. On June 2, the end of a one week's probationary period, Wells was called to the

1. In the Caterpillar case this court upheld the employer's prohibition against wearing "Don't be a Scab" buttons because the use of the term "Scab" among workmen has an "inherent disruptive influence" on work and discipline.

2. Marrisett had been granted a merit increase of ten cents an hour only two days before his discharge.

office where he had an amicable conversation with Mayrath. There was no talk with reference to unions. There was no proof of union activities by Wells except that on May 30th he wore a union button, but removed same when requested to do so by Mayrath. Immediately thereafter Mayrath directed Wells to remain at work.

Thus, as to Wells, we have a finding based upon a dubious inference (National Labor Relations Board v. Kaye, et al., 7 Cir., 272 F.2d 112, 114), in the face of direct and positive evidence to the contrary. We cannot enforce the Board's order as to probationary employee Wells.

■ The Board agreed with the Trial Examiner that no valid offer of reinstatement was made to employee Elmer Barnes. It is doubtful if this issue can properly be raised at this time because respondent did not except to the Trial Examiner's finding on the subject. Section 10(e) of the Act. However, considering the point, we hold the Board's finding that a valid offer of reinstatement was not made to Elmer Barnes is based upon a credibility resolution made by the Trial Examiner. Barnes testified Mayrath told him he could return to work if he would discard his union button. The trier of the facts believed Barnes was telling the truth. If so, Mayrath was imposing an illegal condition for the reinstatement of Barnes.

■ Respondent objects to the provision of the Board's order which restrains it from discouraging membership in "any other labor organization" or "interfering with its employees' rights in any other manner." Here, the respondent mounted a strong, broad-ranged attack in attempting to defeat the union which the employees sought to organize. Under such circumstances, judicial authority supports the enforcement of the Board's order. Allegheny Pepsi-Cola Bottling Company v. National Labor Relations Board, 3 Cir., 312 F.2d 529, 532; Central Mercedita, Inc., v. National Labor Relations Board, 1 Cir., 288 F.2d 809, 812; National Labor Relations Board v. Globe Wireless, Limited, 9 Cir., 193 F.2d 748, 752.

The order of the Board will be enforced except as to employee Wells.

Order as modified,

Enforced.