**DAVISON–PAXON COMPANY, DIVISION OF R. H. MACY & COMPANY, Petitioner-Cross Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.**

No. 71–2365.

United States Court of Appeals, Fifth Circuit.

June 14, 1972.

John G. Skinner, George K. McPherson, Jr., Smith, Currie & Hancock, Atlanta, Ga., for Davison-Paxon Co., Division of R. H. Macy & Co.

Marcel Mallet-Prevost, Asst. Gen. Counsel, NLRB, Washington, D. C., Walter L. Phillips, Regional Director, Tenth Region, NLRB, Atlanta, Ga., William H. DuRoss, III, Washington, D. C., Peter G. Nash, Gen. Counsel, Abigail Cooley Baskir, Morton Namrow, Attys., NLRB, for respondent.

Before THORNBERRY, COLEMAN and INGRAHAM, Circuit Judges.

THORNBERRY, Circuit Judge:

Davison-Paxon Company (Davison's), Petitioner herein, has petitioned this Court to review and set aside a decision and order of the National Labor Relations Board (the Board), Respondent, dated June 11, 1971,[1] and issued pursuant to Section 10 of the National Labor Relations Act (the Act), 29 U.S.C.A. § 151 et seq. The Board, in its answer, has cross-petitioned for enforcement of the order. By the decision and order which are the subject of review the Board (1) found that Davison's had vio-

1. The decision is reported at 191 NLRB No. 10, 77 LRRM 1368 (1971).

lated Sections 8(a) (1) [2] and (3) [3] of the Act by requiring certain of its employees to remove, and by prohibiting these employees from wearing, certain union campaign buttons while at work, and by effecting the termination of one of its employees, Barbara Raborn, who refused to comply with Davison's requirement that such button be removed; and (2) ordered Davison's to cease and desist from these practices, to make whole the terminated employee, and to post the appropriate notices in its department store in Atlanta, Georgia. No jurisdictional questions are in issue.

Davison's is a retail department store chain with stores located in several Southeastern states, including Georgia. In the summer of 1968, the Retail Clerks Union [4] began an active campaign to organize the selling and non-selling personnel, approximately 1,800 employees, at Davison's store located in downtown Atlanta, Georgia. Pursuant to the Board's order, an election was held at the store on October 9, 1970. The result of the election, indicating 649 votes against the Union and 285 votes for the Union, was certified on December 3, 1971.

In April, 1970, many employees of Davison's had begun wearing on their clothing blue union pins about the size of a dime with the letters "R.C.I.A." inscribed thereon. This membership button was worn in both the selling and non-selling areas of the store until the day of the election. It is virtually undisputed that during the period of time in which the employees wore this Union button, no supervisor ever reprimanded any employee for wearing the membership button on or off the selling floor and no employee was in any way restricted in wearing it.

On the afternoon of September 16, 1970, a large group [5] of union organizers entered Davison's store and in groups of two, three and four began walking down the aisles, in and out of departments, talking to sales personnel and distributing large yellow buttons, approximately the size of a Kennedy half dollar, inscribed with large black letters bearing the legend "Vote Yes Retail Clerks International Association, AFL-CIO." There is undisputed evidence in the record that many employees became quite upset, and even angry, over the incident, and many were of the opinion that this type of union campaigning should not be tolerated on the selling floor.[6]

Davison's called a meeting of its supervisors the following morning and instructed them on the action to be taken if employees reported to work wearing the campaign buttons which had been distributed. Melvin Smiley, Davison's Vice President of Personnel, instructed the supervisors at the meeting to ap-

2. Section 8(a) (1) provides as follows:
   (a) It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title . . . 29 U.S.C.A. § 158(a) (1). *See also* note 9, *infra*.

3. Section 8(a) (3) provides, in pertinent part:
   (a) It shall be an unfair labor practice for an employer—
   \* \* \* \* \*
   (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. 29 U.S.C.A. § 158(a) (3).

4. Retail Clerks Local Union No. 1068, AFL-CIO.

5. The actual number of union organizers participating is not clear from the record. Most witnesses estimated their strength to be approximately 75–90 persons. The Trial Examiner found it necessary only to state that a Union witness acknowledged the presence of at least 32 organizers.

6. In describing this incident, witnesses tended to use terms such as "invasion", "mob scene", "pack," and "mobbed". The Trial Examiner, while feeling the descriptions might have been exaggerated, was of the opinion that the activity might well have been the subject of a meritorious Section 8(b) (1) (A) charge against the Union. Davison's, however, did not see fit to bring such a charge, and the character of the incident, as an unfair labor practice at least, is not at issue here.

proach any employee wearing the subject button and read a written statement to the effect, "I am asking you to remove the large, gaudy yellow button. It is not in keeping with the tone and atmosphere of Davison's and is therefore in violation of, our dress regulations, requiring business-like appearance. You are within your rights to wear this button *as long as you are not* in areas with customers."

On the date this notice was issued to the supervisors, September 17, employee Barbara Raborn, who was a leading union adherent, wore on the selling floor a large, yellow Retail Clerks button with large, black lettering.[7] Raborn was immediately advised by Elsa Daniel, a supervisor and assistant buyer, that she could not wear the button because it was in violation of the dress regulations.[8] She was asked to remove the button, and she immediately complied.

On the next day, September 18, Raborn, upon the advice of union officials and an attorney, again wore the button on the selling floor. Her floor supervisor, Elizabeth Oastler, told Raborn, as Daniel had done the previous day, that the large yellow button was not in keeping with Davison's dress regulations and could not be worn on the selling floor. Raborn thereupon refused the supervisor's request that she remove the button and stated that she had a right to wear it. Raborn was taken to the office of Barbara Franze, Davison's employment manager, where, after being given numerous unheeded requests to remove the button, she was discharged.

The only real issue involved in the instant case is whether, under all the circumstances presented, the wearing of the button in question on Davison's selling floor was protected activity under Section 7 [9] of the Act. If it is deemed such, Davison's is in clear violation of both 8 (a) (1), by prohibiting the activity, and 8(a) (3), by discharging Raborn. If wearing the button is not found to be protected activity, no violation of the Act can be made out.[10]

7. There was some conflict before the Trial Examiner as to which of two buttons Raborn actually wore. Raborn claims she wore a button bearing the legend "Vote Retail Clerks Union, AFL–CIO." Davison's claims she was wearing a button with the statement, "Vote Yes" in large black letters in the center with "Retail Clerks Union, AFL–CIO," in smaller letters around the edge. Both buttons were the same size, were of the same bright yellow color with large black letters, and both advocated voting for the Union. We, like the Trial Examiner, do not, therefore, find the dispute over this fact to be significant.

8. There is some conflict as to whether Raborn was told at this point that she could wear the button in the non-selling areas of the store. Daniel asserts that although she failed to read the written statement word-for-word, she did reveal the substance of the statement. Raborn testified that she did not remember any such limitation on the request. At any rate, it is uncontradicted that Raborn was told at the later meeting in the office of the employment manager that she could wear the button in the non-selling areas. This controversy is not deemed significant because the Trial Ex·

aminer did not base his decision on any overbreadth in the rule.

9. Section 7 provides:
   Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title.
   29 U.S.C.A. § 157.

10. A finding of anti-union animus on the part of Davison's might constitute an unfair labor practice in spite of the activity's lack of 8(a) (1) protection. *See* Textile Workers Union v. Darlington Mfg. Co., 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965); NLRB v. Adams Dairy, Inc., 8th Cir. 1965, 350 F.2d 108; NLRB v. Power Equipment Co., 6th Cir. 1963, 313 F.2d 438; Revere Camera Co. v. NLRB, 7th Cir. 1962, 304 F.2d 162. Here, however,

The Trial Examiner found on the basis of the principles enunciated in Eckerd's Market, Incorporated, 183 NLRB No. 40, 74 LRRM 1319 (1970), that there was no reason based on "business, efficiency, or controversy" for Davison's to prohibit its employees from wearing the yellow button on its selling floor. The Board adopted the Trial Examiner's opinion in its entirety. We find *Eckerd's Market* to be clearly distinguishable from the instant case.

In *Eckerd's Market*, the Board held only that employees' contact with the public was not *standing alone* a sufficient basis for the employer's prohibiting the wearing of the small nickel-sized button involved there. There was no showing that the wearing of the button had affected business or discipline and no proof of animosity among the employees which might have been increased by such activity. The decision was in line with numerous other decisions, before and after *Eckerd's Market,* holding that the wearing of a small, innocuous, non-provocative union membership pin is protected activity under Section 7 absent other special circumstances. *See* NLRB v Floridan Hotel of Tampa, Incorporated, 5th Cir. 1963, 318 F.2d 545; NLRB v. Floridan Hotel of Tampa, Incorporated, 5th Cir. 1962, 300 F.2d 204; Consolidated Casinos Corporation, 164 NLRB 950, 65 LRRM 1300 (1967); NLRB v. Harrah's Club, 143 NLRB No. 127, 53 LRRM 1500 (1963), *enforcement denied,* 9th Cir. 1964, 337 F.2d 177. Moreover, in Republic Aviation Corporation v. NLRB, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945), the Supreme Court, refusing to find that the wearing of a steward button by an employee was a representation that the employer either approved or recognized the union as the representative of the employees at least when there was no competing labor organization in the plant, held that the right of employees to wear union insignia at work was a reasonable and legitimate form of union activity. 324 U.S. at 802 n. 7, 65 S.Ct. 982.

The rule applicable to button regulations is perhaps best explained in the Floridan Hotel decisions. In the first case, NLRB v. Floridan Hotel of Tampa, Incorporated, 5th Cir. 1962, 300 F.2d 204, the employer had issued a bulletin which stated, "No badges of any kind will be worn by any employee so that they may be seen by any customer or guest." The Board held that the rule was illegal in its entirety because it was enforced against persons who had no contact with customers. This Court, finding the order to have overreached its basis in finding the prohibition illegal as it related to employees in constant contact with the public, stated:

Both the Examiner and the Board recognize that the right of employees to wear a union badge while at work does not exist under all circumstances and all conditions. If this is not a case where the employer has a right to prohibit the wearing of the badge by employees who are in contact with the public, then any rule prohibiting the wearing of a small neat button, such as is the union insignia here, might be regarded as violative of the Act. The Board expressly refrained from deciding this question. Since it has not passed upon the question, we do not consider it. We think the Board should have the opportunity of deciding the question if it sees fit to do so.
300 F.2d at 207.

The Board on remand found that the anti-button rule as it was applied to employees in contact with customers was unjustified under the circumstances and was therefore, a violation of the Act. In affirming this decision of the Board in the second Floridan Hotel case, Judge Bell made clear certain limitations on the employees' right to wear such buttons.

Therefore, we think it proper to point out that our decision is limited to the restricted facts before us. For example, there is *no evidence that the un-*

Davison's anti-button rule was clearly not adopted for discriminatory purposes

and there was no anti-union animus indicated or found.

*ion pins detracted from the dignity of the business operation or of the employees wearing them on duty.* Thus, whether a different case might be presented as to employees in uniform and those not in uniform is not presented. There is no evidence of customer complaints. As stated, one customer did call the wearing of the pins to the attention of management. There is no evidence of any diminution in the business of the hotel. *No friction resulting from animosity between rival unions or union and non-union groups of employees* that might interfere with normal operational and disciplinary procedures of the hotel was present.

In short, what we have before us is a rule prohibiting the wearing of a *small pin, much like the ordinary civic club pin,* by union members denoting their interest and pride in their organization and by stewards signifying their union position. We approve the finding by the Board that this may not be proscribed, with the caveat that *our approval is related specifically to the factual situation here presented,* or in a like or substantially related manner.

318 F.2d at 548–549 (emphasis added).

We have no quarrel with these decisions and the balance struck by the Board and the courts in these cases. Their connection with the instant case, however, is tenuous at best. Numerous characteristics to be found in the instant case distinguish it from these prior decisions and cause us to strike differently the balance between the employees' right to organize and the employer's right to protect his business. Davison's contends that it was justified in enforcing the general dress code in effect at the time in question [11] by prohibiting the wearing of these buttons because (1) they were

unfashionable and in poor taste, and (2) they created a danger of disruption on the selling floor. We think both these justifications were substantiated before the Board.

First, the buttons here were not the standard nickel or dime-sized union membership pin involved in prior cases. *See* NLRB v. Floridan Hotel of Tampa, Inc., 5th Cir. 1963, 318 F.2d 545; NLRB v. Floridan Hotel of Tampa, Inc., 5th Cir. 1962, 300 F.2d 204; Consolidated Casinos Corp., *supra*; NLRB v. Harrah's Club, *supra.* This type of button is generally referred to in prior decisions as "neat, small, and inconspicuous." The button in the instant case was as large as a Kennedy half dollar and its bright color made it anything but inconspicuous. The Trial Examiner opined below, "When general principles of labor law are determined by the eighth or the quarter of an inch as measured by rule or caliper, then it will be time for 'Bumble' to turn over in his grave and repeat his famous observation, 'the law is a Ass.'" We think, however, that it would be equally asinine, under the circumstances of this case, to ignore the size of the button and its capacity for being noticed. The testimony of all witnesses clearly established that Davison's is, and always has been, concerned about the appearance of its employees before its customers and has always insisted that its sales personnel appear in businesslike attire and without items which are unfashionable or in bad taste. The Trial Examiner found in fact that "[o]bviously, [Davison's] liked the idea of its employees doubling both as customers and fashion models of [its] merchandise *which, of course was only good business.*" (emphasis added). The record is replete with instances where management officials have had occasion to prohibit the wearing of items which were at the time deemed to be in poor taste.[12] Under these circumstances, we

---

11. The dress code, in effect at Davison's for many years, provided generally for the use of good taste and judgment, fashionable attire, and prohibitions against anything that might offend or be controversial to a customer.

12. In fact, Raborn had twice previously been sent home for her failure to conform to the Company's dress code—once for wearing culottes and once for wearing a skirt which was too short.

believe for a fashionable department store's management to distinguish a small, blue membership button from a large, yellow and black campaign button takes on more indicia of reasonableness than in the normal case of this kind. *See* Fabri-Tek, Incorporated v. NLRB, 8th Cir. 1965, 352 F.2d 577. Retail Store Employees Union v. Rothman, 1962, 112 U.S.App.D.C. 2, 298 F.2d 330; General Counsel Opinion (Case No. SR-1174), 47 LRRM 1570 (1961).

Secondly, there was undisputed evidence in the instant case that there was some animosity between union and anti-union factions at the store, which caused serious concern to Davison's management. A group of anti-union employees, known as the Concerned Employees Committee, had earlier organized at the store and had actively campaigned against the Retail Clerks by handing out their own campaign materials outside the store. There was also evidence that some anti-union employees either had requested transfers from one department to another or resigned because of the conflicts and tensions arising over the union campaign. Moreover, the method by which these buttons were distributed was shown to have added to employee tension. There were numerous reports from the employees to the effect that they were excited, upset and fearful on the afternoon of the union distribution. These facts clearly demonstrate a conflict between the rivaling employees which tends to substantiate the reasonableness of management's fear that the union conflict might erupt on the sales floor if proper steps were not taken against use of the yellow button. This clearly distinguishes the instant situation from previous cases.

Finally, the button in question here is not altogether innocuous and non-provocative. All other cases allowing use of union buttons involve insignia or membership pins, indicating only that the wearer is proud of his affiliation with the Union. *See* Republic Aviation Corporation v. NLRB, *supra*; NLRB v. Floridan Hotel of Tampa, Incorporated, *supra*; Eckerd's Market Incorporated, *supra*; Consolidated Casinos Corporation, *supra*; NLRB v. Harrah's Club, *supra*. Davison's allowed free use of this type of button throughout the campaign in both selling and non-selling areas. Involved here, however, is admittedly a *campaign* button urging all viewers to vote for the union. The button, by its design, size, and color plainly indicates an intent to convey its message loudly and clearly to the greatest number of people possible. We recognize that the button is not as provocative as the "don't be a scab" message involved in Caterpillar Tractor Company v. NLRB, 7th Cir. 1956, 230 F.2d 357. We cannot, however, fail to recognize that a campaign button is more provocative and more likely to cause discussion and counter-discussion than would a membership button. *See* United Parcel Service, —— NLRB ——, —— LRRM —— (No. TXD-787–71, January 25, 1971).

In light of Davison's business operation, we think that the prohibition in issue was clearly reasonable. The Board and the courts have consistently recognized the unique nature of retail and service establishments and the peculiar problems they face in the area of union campaigning. In May Department Stores, 59 NLRB 976, 15 LRRM 173 (1945), *modified,* 8th Cir. 1946, 154 F.2d 533, *modified,* 326 U.S. 376, 66 S.Ct. 203, 90 L.Ed. 145, for example, the employer had prohibited solicitation in all areas of its stores, contending that department stores were by their very nature distinguishable from industrial plants and should thus be allowed to limit solicitation by employees anywhere in the store. The Board agreed with this analysis as it related to the selling areas of the store and held that a solicitation prohibition in such selling areas was permissible. The reasoning behind this distinction was later stated in Marshall Field & Company, 98 NLRB No. 11, 29 LRRM 1305 (1952), *modified,* 7th Cir. 1952, 200 F. 2d 375.

The Board has consistently held that such a prohibition is not a violation of the Act, because ". . . though

both the solicitor and the person solicited are on their lunch hour . . . the solicitation, if carried on the selling floor where customers are normally present, *might conceivably* be disruptive of Respondent's business.

98 NLRB at 90. (emphasis added).

In modifying the order, the Seventh Circuit in quoting Member Herzog's dissent to the Board's decision, noted that the selling areas "should not be converted into an arena for the organization of employees. The statute does not command that result, and this Board should not facilitate it." 200 F.2d at 378.

We recognize that in both *May* and *Marshall Field,* the Court was concerned with solicitation activities. We do not question the Trial Examiner's statement that the wearing of buttons is not a form of solicitation. Republic Aviation Corporation v. NLRB, *supra*; Serv-Air, Incorporated v. NLRB, 10th Cir. 1968, 395 F.2d 557; NLRB v. Mayrath Company, 7th Cir. 1963, 319 F.2d 424; NLRB v. Power Equipment Company, 6th Cir. 1963, 313 F.2d 438, Contra Fabri-Tek, Incorporated v. NLRB, 8th Cir. 1965, 352

F.2d 577. We do believe, however, that much of the reasoning employed in *May* and *Marshall Field* is applicable here. Davison's rule is aimed at preventing the selling area of its store from becoming an arena, not only for union activity but for any controversial issue. The button here, although not solicitation in the strict sense usually employed, is more highly solicitous than the buttons involved in other analogous cases. Although the issue of whether to unionize or not may no longer bring on the action and reaction that it once did in our history, it still is considered a political issue on which reasonable minds might differ.[13] Here, it is undisputed that Davison's was concerned primarily with the button's capacity to antagonize its customers.[14] The possibility of offending customers and, as a result, losing customers is an immediate and pressing concern to retail and service establishments and must be considered by the Board. *See* NLRB v. Brown, 380 U.S. 278, 85 S. Ct. 980, 13 L.Ed.2d 839 (1965). We do not believe that the Board had discretion under these facts to ignore this reasonable concern.[15]

---

13. Judge Lewis has stated the problem thusly:

[I]t seems totally unrealistic to deny or ignore the fact that unionism is a source of controversy. . . . Often unions take publicized positions upon controversial political and legislative issues. These issues are not of management's making and it should not be forced to expose its customer good will to the potential of loss of business by indirection.

NLRB v. Floridan Hotel of Tampa, Inc., 5th Cir. 1963, 318 F.2d 545, 549. (dissenting opinion).

14. There is no issue of a discriminatory motive here. *See* note 10, *supra*. Political campaign pins of all kinds were shown to be consistently prohibited by Davison's. Although Raborn testified she had twice worn political pins without reprimand, the Trial Examiner was evidently satisfied that had the supervisors been aware of any such activity they would have ordered it ceased.

15. The following colloquy between the Trial Examiner and one of Davison's witnesses indicates some lack of understanding on

the part of the Examiner with this concern:

Q. Have there been other occasions where you have to speak to employees about wearing controversial things?
A. Yes, we had a peace march here somewhere, I don't know; it was back last spring or last fall, I don't know. But they had a peace march in Atlanta and I had one of my men come in and he had a mourning band—a black mourning band—on his sleeve, and I requested him to remove that and told him that it was a controversial subject and he couldn't wear it in the selling areas.
TRIAL EXAMINER: Is peace controversial?
THE WITNESS: This mourning band? Well I feel there are a lot of people who are in South Vietnam fighting, I think that is controversial, yes, sir.

Although the quest for peace may not be controversial, the wearing of black mourning bands under these same circumstances has evoked considerable reaction about which Davison's undoubtedly could be justly concerned. *See e. g.* Tinker v. Des Moines Independent Community

Moreover, we realize that the effect of an argument or heated exchange among employees in the selling area of a department store could easily be to cause customers to discontinue their patronage. Under the circumstances of this case, wherein there was ample evidence of employee unrest increased to a great extent by the method employed by the Union to distribute the buttons, we do not think it within the discretion of the Board to ignore or side-step the Company's judgment in its attempt to keep its customers.

We do not deem it significant that no actual controversy between employees or between customers and employees had erupted at the time of the institution of the rule. First, the buttons had not as yet shown their face on the selling floor. Secondly, as was stated in NLRB v. Harrah's Club, 9th Cir. 1964, 337 F.2d 177.

> Most business establishments, particularly those which, like respondent, furnish service rather than goods, try to project a certain type of image to the public. One of the most essential elements in that image is the appearance of its uniformed employees who furnish that service in person to customers. The evidence shows that respondent has paid close attention to its public image by a uniform policy of long standing against the wearing of jewelry of any kind on the uniform. Respondent should not be required to wait until it receives complaints or suffers a decline in business to prove special circumstances. Businessmen are required to anticipate such occurrences and avoid them if they wish to remain in business. This is a valid exercise of business judgment, and it is not the province of the Board or of this court to substitute its judgment for that of management so long as the exercise is reasonable and does not interfere with a protected purpose.

School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

337 F.2d at 180. *See also* NLRB v. Floridan Hotels of Tampa, Incorporated, *supra.* Under the circumstances of this case, we find that Davison's exercise of business judgment was reasonable.

We wish to emphasize that this decision is restricted to the facts of the instant case. Here we are faced with a long-standing dress code, instituted well before the union campaign. There is absolutely no evidence of anti-union animus on the part of the employer, and the anti-button rule was not merely a part of a series of unfair labor practices committed by the employer in response to the union threat.[16] Here the employer instituted the anti-button rule as an interpretation of the general dress code, which was reasonable in light of the peculiar characteristics of the button involved here, and limited the rule's application to employees on the selling floor. Undisputed evidence was here presented that employee factions and the union's method of distributing the buttons had caused labor unrest, which created at least the possibility that Davison's labor problems would erupt on the selling floor. We hold only that under these particular facts the Board, in prohibiting enforcement of Davison's anti-button rule, did not take proper cognizance of the employer's interest in protecting his business and thus incorrectly struck the balance of interests involved.

We recognize, as a reviewing court considering the opinion and order of the Board, that we have only the power of "limited judicial review." NLRB v. Truck Drivers Local Union, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957) (Buffalo Liner); Universal Camera Corporation v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The Supreme Court, however, in NLRB v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965), made clear that the following standard was to be applied in determining whether to enforce the Board's order.

16. *See* Brewton Fashions, Inc. v. NLRB, 5th Cir. 1966, 361 F.2d 8; Campbell Soup Co., 159 NLRB No. 18, 62 LRRM 1352 (1966).

When we used the phrase "limited judicial review" we did not mean that the balance struck by the Board is immune from judicial examination and reversal in proper cases. Courts are expressly empowered to enforce, modify or set aside, in whole or in part, the Board's orders, except that the findings of the Board with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive. National Labor Relations Act, as amended, §§ 10(e), (f), 29 U.S.C. §§ 160(e), (f) (1958 ed.). Courts should be "slow to overturn an administrative decision," National Labor Relations Board v. Babcock & Wilcox Co., 351 U.S. 105, 112, 76 S.Ct. 679, 100 L.Ed. 975, but they are not left "to 'sheer acceptance' of the Board's conclusions," Republic Aviation Corp. v. National Labor Relations Board, 324 U.S. 793, 803, 65 S.Ct. 982, 89 L.Ed. 1372. Reviewing courts are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute. Such review is always properly within the judicial province, and courts would abdicate their responsibility if they did not fully review such administrative decisions. Of course due deference is to be rendered to agency determinations of fact, so long as there is substantial evidence to be found in the record as a whole. But where, as here, the review is not of a question of fact, but of a judgment as to the proper balance to be struck between conflicting interests, "[t]he deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress." American Ship Building Co. v. National Labor Relations Board, 380 U.S. [300,] at 318, 85 S.Ct. [955,] at 967, [13 L.Ed.2d 855.]

380 U.S. at 290–292, 85 S.Ct. at 988.[17] We similarly find in the instant case that we are not called upon to determine facts, most of which here are undisputed,[18] but rather to maintain a proper balance between conflicting interests of management and labor, both of which are essential to the well-being of economic society. Thus unrestrained from the substantial evidence test and with the firm belief that the Board here struck the balance incorrectly, we set aside the order of the Board and deny its enforcement.

Enforcement denied.

---

17. *See also* NLRB v. Fruit and Vegetable Packers, 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964); NLRB v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963); Local 357 v. NLRB, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961); NLRB v. Drivers, Chauffeurs, Helpers, Local Union, 362 U.S. 274, 80 S.Ct. 706, 4 L.Ed.2d 710 (1960); NLRB v. Insurance Agents, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960).

18. The Trial Examiner failed to discredit any of the testimony given, finding the witnesses to be an exceptionally truthful group.