**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**POWER EQUIPMENT COMPANY,
Respondent.**

No. 14959.

United States Court of Appeals
Sixth Circuit.

Feb. 15, 1963.

William J. Avrutis, Washington, D. C., for petitioner, Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Alexander McMurtrie, Atty., National Labor Relations Board, Washington, D. C., on the brief.

Fred O. Burkhalter, Cleveland, Ohio, for respondent, Fred O. Burkhalter, of Jamison, Ulrich, Hope, Johnson & Burt, Cleveland, Ohio, on the brief.

Before CECIL, Chief Judge, MILLER, Circuit Judge, and BOYD, District Judge.

CECIL, Chief Judge.

This cause is before the Court upon petition of the National Labor Relations Board, pursuant to Section 160(e), Title 29 U.S.C., for enforcement of an order issued on February 9, 1962, against respondent, Power Equipment Company. The Board's Decision and Order are reported at 135 N.L.R.B. No. 94. This Court has jurisdiction of the proceeding, the alleged unfair labor practices having occurred in Galion, Ohio, where the respondent operates a power supply equipment plant.

The Board found that the respondent, hereinafter sometimes called employer, violated Section 8(a) (1) (Section 158 (a) (1), Title 29 U.S.C.) of the National Labor Relations Act in three respects. 1. Interrogating Mary B. Crissinger, an employee, concerning her union activities and sympathies. 2. Promising benefits to one Donald E. Shipman, another employee, if he would abandon his union activity, and 3. By ordering eight employees to remove bowling shirts bearing union insignia which they were wearing during working hours.

According to the intermediate report of the trial examiner, undisputed facts revealed that the alleged unfair labor practices herein were framed in a background that naturally created labor unrest. In May of 1960, there was an intensive proxy fight between North Electric Company and Neptune Meter Company for the control of the respondent's board of directors. In this fight for control, the incumbent management of respondent supported the Neptune Company. North Electric won control of respondent's board of directors about the middle of May 1960. The new board appointed North Electric's president, Wil-

liam Tucker, and its vice-president, William Graham, to be president and executive vice-president, respectively, of the respondent. In July 1960, Graham employed Alan V. Ryon to be industrial relations director and in turn Ryon hired Carl Tinstman as training manager.

At the time North Electric acquired control of the respondent, there were employees of the respondent in both hourly wage and salaried ranks who had been employed by North Electric. There apparently had been considerable animus between the two companies and it was said that the best recommendation an applicant for a job with respondent could have was that he had resigned from or that he had been fired from North Electric. With the respondent becoming a subsidiary company, its employees feared that North Electric employees would replace them or be given seniority over them. Rumors of what was going to happen were rife and the new management had a labor problem of trying to quiet and satisfy its employees.

In the midst of this, about the middle of June 1960, International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, AFL–CIO, hereinafter referred to as the Union, began an organization campaign among respondent's employees. In October of 1960, the Union filed with the Board a representation petition seeking certification as collective bargaining representative of respondent's production and maintenance employees.

█ In order to solve the labor unrest and learn what the employees' grievances were, Graham, Ryon, Tinstman, and some supervisors interviewed a great many of the employees. With the exception of one interview, the trial examiner found that these interviews were a legitimate effort on the part of management to solve its labor problems and that no violation of the Act was involved. The trial examiner found that the interview with Mary B. Crissinger was an unlawful interrogation and constituted an unfair labor practice. The Board sustained the examiner in these findings.

Mrs. Crissinger testified that she was interviewed by Mr. Sipes, a supervisor: "Well, he just said it—talked about the weather. And then small talk. Then he asked me, he said: 'He heard that I attended a meeting. He was surprised at me. That he heard that the other girls, some other people had. That he didn't know that I had attended.' I said: 'Yes, sir. I had. In fact, I attended two.'" The examiner's analysis and finding on this is "I conclude and find that Supervisor Sipes interrogated employee Crissinger with respect to her union activity, in his inquiry to her with respect to her attendance at a union meeting, and therefore, violated Section 8(a) (1) of the Act."

This Court said in National Labor Relations Board v. Tennessee Coach Co., 191 F.2d 546, 555, C.A. 6: "Before inquiries as to union membership and statements by employers or supervisory employees can be held to be unfair labor practices, they must be shown to have some relation to the coercion or restraint of the employees in their right of self-organization." In National Labor Relations Board v. McCatron et al., 216 F. 2d 212, 216, C.A.9, cert. denied, 348 U.S. 943, 75 S.Ct. 365, 99 L.Ed. 738, the court said: "Interrogation regarding union activity does not in and of itself violate § 8(a) (1). * * * We are of the opinion that in order to violate § 8(a) (1) such interrogation must either contain an express or implied threat or promise, or form part of an overall pattern whose tendency is to restrain or coerce." We said in United Fireworks Mfg. Co. v. National Labor Relations Board, 252 F.2d 428, 430, C.A. 6: "Interrogation of employees about membership in the union may or may not amount to coercion, depending upon the manner in which it is done and the surrounding circumstances."

We find nothing in connection with the interview of Crissinger that justifies the conclusion that the supervisor had the purpose or effect of intimidating or coercing her or interfering with her right or freedom to join a labor organi-

zation, if she chose to do so. There were no promises of benefits or threats of reprisal. As a matter of fact she was assured that her job was not in jeopardy. Viewing the record as a whole, the finding of the Board that the respondent violated section 8(a) (1), by its interview of Crissinger through a supervisor is not supported by substantial evidence. National Labor Relations Board v. Armco Drainage & Metal Products, 220 F. 2d 573, 582–583, C.A. 6, cert. denied 350 U.S. 838, 76 S.Ct. 76, 100 L.Ed. 748. Enforcement of the Board's order with respect to the interrogation of Crissinger will be denied.

■ Vice President Graham interviewed employee Don E. Shipman at length concerning his qualifications for ultimate promotion to a position at management level. Mr. Graham testified that Shipman's file had been turned over to him by an assistant along with the files of a number of other employees whose records indicated that they had management potential. In answer to Graham's question in the interview, Shipman said that he had been told before that he had talent for management. He left the Kroger Company because he was not given a promised managership. The respondent was expanding rapidly and there was need for the development of new management material. Graham interviewed other prospects for this purpose. During the interview the only reference to the Union was made by Shipman. No request or suggestion was made by Graham that he abandon the Union. It was assumed, however, that if he were in management, he would have to give up union activities.

At the time of the interview, Shipman had been twice reprimanded for spreading rumors and was on probation, subject to being discharged for further violation. It was known by management that he had been active in organizing the employees for the Union. The Union had already filed its petition for certification.

The trial examiner found from the testimony of Graham and Shipman that Graham offered Shipman a job at man-

agement level to be effective as soon as Shipman took the necessary steps to qualify him for such a position. His concluding finding which was affirmed by the Board is as follows: "I conclude and find that Vice President Graham made a promise of benefit to employee Shipman to defeat UAW's organizational activity. I make this concluding finding in view of the time at which it was made, which was after UAW filed its petition for certification, and the fact that Shipman was reprimanded and threatened with discharge for spreading rumors charactered by President Tucker as malicious and reprehensible, and after Tucker and Vice President Graham characterized the employees who spread the rumors as 'Benedict Arnolds.' In ordinary circumstances, Respondent would not have considered Shipman as executive material because of this conduct. It could be that Vice President Graham was willing to bring him into the management fold in spite of his rumor spreading. If he did, it was because it meant Shipman's departure from the organizational efforts of UAW. In that case although a legal object is present, an illegal object is also present."

■ This inference drawn by the examiner and the Board is as reasonable as the contrary one that the Vice President was honestly trying to develop management material and made no promise to induce Shipman to abandon his union activities. As a reviewing court, we are not free to draw this latter inference, even though we may think it the more logical and might do so were we hearing the case de novo. National Labor Relations Board v. Nevada Consolidated Copper Corp., 316 U.S. 105, 106–107, 62 S. Ct. 960, 86 L.Ed. 1305; Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456; National Labor Relations Board v. Walton Manufacturing Co., 369 U.S. 404, 405, 82 S.Ct. 853, 7 L.Ed.2d 829; National Labor Relations Board v. Ford, 170 F.2d 735, 739, C.A. 6; Old King Cole v. National Labor Relations Board, 250 F.2d 791, 792, C.A. 6; National Labor Relations Board v. Bendix Corporation (Research Laboratories Division), 299 F.2d 308, 310, C.A. 6, cert. denied, 371 U.S. 827, 83 S.Ct. 47, 9 L.Ed. 2d 65; National Labor Relations Board v. Flemingsburg Manufacturing Co., 300 F.2d 182, 184, C.A. 6. We sustain the finding of the Board in respect to Shipman.

■ On Friday afternoon, either October 27th or November 4th, 1960, eight employees in the Transformer Department came to work for the second shift wearing bowling shirts upon which was placed an emblem of the Union. This emblem consisted of the letters "UAW" about two and a half to three inches in size across the back, at the shoulders. On this occasion of wearing the shirts, the employees intended to bowl after work. At about 6:30 in the evening, after the employees had worn the shirts at work for approximately three hours, Supervisor Wiggins took them all to the office of Industrial Relations Director Ryon. Mr. Ryon gave these employees three alternative choices: 1. Take the shirts off immediately; 2. Go home and change them and return to work on their own time, and 3. Go home, "clocking out" and not returning. The shirts were removed and upon being asked for an explanation, Ryon refused to give any reason for the order.

The Board affirmed the finding of the trial examiner that both the order to remove the shirts and the peremptory refusal of Ryon to explain the order constituted violations of section 8(a) (1).

At the hearing before the trial examiner, the employer sought to justify the order on the ground that the wearing of the shirts caused a commotion and disturbance among other employees. It was claimed that some employees stopped the operation of their machines to look at the employees wearing the shirts and that interference with production and discipline resulted. Ryon also claimed that two other unions were attempting to organize the employees at the same time and that the shirts were being worn to irritate him

442

■ The trial examiner found that the evidence did not substantiate these claims of the employer. The evidence being in conflict on these claims we are bound to accept the examiner's findings. National Labor Relations Board v. Walton Manufacturing Co., 369 U.S. 404, 407–408, 82 S.Ct. 853; Revere Camera Company v. National Labor Relations Board, 304 F.2d 162, 164, C.A. 7; National Labor Relations Board v. Bendix Corp. (Research Laboratories Division), 299 F.2d 308, 310, C.A. 6, cert. denied 371 U.S. 827, 83 S.Ct. 47, 9 L.Ed.2d 65; United Fireworks Mfg. Co. v. National Labor Relations Board, 252 F.2d 428, 430, C.A. 6; National Labor Relations Board v. United Brass Works, Inc., 287 F.2d 689, 691, C.A. 4.

The wearing of union insignia has been held to be a protected activity in furtherance of the rights of self-organization granted by section 7 of the Act. (Section 157, Title 29, U.S.C.) Republic Aviation Corp. v. National Labor Relations Board, 324 U.S. 793, 801, 65 S.Ct. 982, 89 L.Ed. 1372; Kimble Glass Company v. National Labor Relations Board, 230 F.2d 484, C.A. 6; cert. denied 352 U.S. 836, 77 S.Ct. 55, 1 L.Ed.2d 54; Revere Camera Company v. National Labor Relations Board, 304 F.2d 162, 165, C.A. 7; National Labor Relations Board v. Essex Wire Corporation, 245 F.2d 589, 593, C.A. 9.

■ "The crux of a violation of section 8(a) (1) or (3) is the true purpose or real motive of the employer in taking the action complained of." Pittsburgh-Des Moines Steel Company v. National Labor Relations Board, 284 F.2d 74, 77, C.A. 9. See also Associated Press v. National Labor Relations Board, 301 U.S. 103, 132, 57 S.Ct. 650, 81 L.Ed. 953.

The attitude of management toward unions was well known to the employees. Both President Tucker and Vice President Graham had made speeches to the employees on September 16, 1960, in which they stated very emphatically that they were opposed to unions. The Trial Examiner and the Board found that the respondent would pursue the objective of defeating the unions to the extent allowed by law. They also found that the speeches of September 16th were within the limits of permissible free speech and not illegal.

It was in this background of opposition to unions that Director Ryon required the employees to take off the bowling shirts. Upon the failure of the respondent to prove any unusual circumstances requiring the removal of the shirts and because of Ryon's refusal to give any explanation for the order, we conclude that the Board's finding of a violation of section 8(a) (1) in this respect is supported by the evidence. Republic Aviation Corp. v. National Labor Relations Board, 324 U.S. 793, 801, 804, 65 S.Ct. 982, 89 L.Ed. 1372; National Labor Relations Board v. Essex Wire Corp., 245 F.2d 589, 593, C.A. 9. We sustain the finding of the Board that the order to remove the bowling shirts constituted an unfair labor practice.

Our conclusion is based on the particular facts and circumstances surrounding the incident in question. We would not want this to be interpreted as a ruling of this Court that an employer is without authority to establish rules for the discipline of its employees, including a reasonable regulation as to what they may or may not wear. Subdivision (c) of No. 1 of the order, and the Notice to Employees with reference to bowling shirts are so sweeping in their coverage that they deprive the employer of the right to make proper rules for the discipline of its employees. An employer ought to be permitted, as a matter of discipline, to establish a rule that no athletic shirts or no insignia upon clothing, or no clothing of an unusual nature, could be worn during working hours. Such a rule would have to be general and non-discriminatory as to any person, group or organization. The fault in the instant case was that a peremptory order was made not based on reason or any existing rule.

The order of the Board when modified in accordance with this opinion will be enforced.

The case will be remanded to the Board with instructions to fashion an amended order consistent with this opinion and to submit it to the Court for approval.