**G & A TRUCK LINE, INC., Petitioner,**
v.
**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 18423.

United States Court of Appeals
Sixth Circuit.

Feb. 18, 1969.

John P. Boeschenstein, Muskegon, Mich., for petitioner.

Joseph C. Thackery, N.L.R.B., Washington, D. C., for respondent; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Glen M. Bendixsen, Joseph C. Thackery, Attys., N.L.R.B., Washington, D. C., on brief.

Before PHILLIPS and CELEBREZZE, Circuit Judges, and McALLISTER, Senior Circuit Judge.

CELEBREZZE, Circuit Judge.

The case before us concerns the National Labor Relations Board's finding, reported at 168 N.L.R.B. 106, that G & A Truck Line, Inc., violated Section 8(a)(1) of the Labor Management Relations Act, 29 U.S.C. § 158(a) (1) by questioning its employees about their union membership, sentiments, and activities in a coercive manner and by trying to persuade and persuading them by threats

and promises to withdraw their union cards. The Board also found that G & A violated Section 8(a) (5) and (1) of the Act, 29 U.S.C. § 158(a) (5) and (1) by refusing to bargain with Local 7, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Independent, (hereinafter Union) after the presentation of authorization cards signed by a majority of its mechanics and helpers in an appropriate bargaining unit.

G & A Truck Lines, Inc., hereinafter Petitioner, asks this Court to review the Board's order, supra, with regard to the violations of Section 8(a) (5) and (1), i. e. refusing to recognize the Union upon demand; while the National Labor Relations Board, hereinafter Respondent or Board, cross-petitioned for enforcement.

The Board in reviewing the Trial Examiner's decision adopted the finding that Petitioner violated Section 8(a) (1) of the Act "by interrogating employees about Union membership, sentiments, and activities; persuading employees by promises of benefit and threats of reprisal to withdraw their Union authorization cards and applications for membership; and assisting them to withdraw such cards."

■ Petitioner does not seek modification of this part of the Board's final order. Although the Court will not deal specifically with these findings here, we do find that the record contains substantial evidence to support them. N. L. R. B. v. Cumberland Shoe Corporation, 351 F. 2d 917 (6th Cir. 1965).

The issue before this Court arises out of the second finding relating to the violations of Section 8(a) (5) and (1) of the Act. Therefore, the facts which are relevant to this issue will be presented here.

The Petitioner employs about 50 drivers at its Three Rivers and White Pigeon terminals. These employees have been represented by the Union for over thirty years. Also employed at Petitioner's two terminals was an ununionized group of nine employees consisting of mechanics and washers. During December of 1966 Mike Hartsox, a Three Rivers mechanic, expressed interest in joining the Union to Mike Frain, the Union steward at Three Rivers. Frain gave him membership authorization cards which were distributed to the other employees. There were no unfair labor practices complained of during this organizational period.

On January 3, 1968, the Union had received signed authorization cards from eight of the nine employees in the mechanics unit. That morning Union Vice President Brand presented six signed cards to the Petitioner's Secretary, John Jones. The purpose of this presentation was for recognition pursuant to a provision contained in the drivers' contract.[1] Jones then copied the names of the six employees and stated he would talk with Petitioner's President, Thomas MacNamara. MacNamara called or talked with each employee who confirmed signing the cards.[2] In the afternoon upon Brand's presentation of the recognition agreement, MacNamara refused to sign for he doubted the majority status presented by the Union.

Petitioner's doubt rested upon the validity of the cards signed by Salisbury

---

1. "This provision of the contract, entitled 'Non-Covered Units,' reads as follows: This Agreement shall not be applicable to those operations of the Employer where the employees are covered by a collective bargaining agreement with a Union not signatory to this Agreement or to those employees who have not designated a signatory Union as their collective bargaining agent. At such time as a majority of such employees in an appropriate bargaining unit designate, as evidenced by a card check, a signatory Union as their collective bargaining agent, they shall automatically be covered by this Agreement and applicable Supplemental Agreements. In such cases the parties may by mutual agreement work out a wage and hour schedule, subject to Joint Area Committee approval."

2. This constituted part of the violations of Section 8(a) (1) of the Act not contested here.

and Anderson. MacNamara called Anderson at home and asked him to drop by the office to discuss the Union. When he arrived, Tom MacNamara, Glenn McNamara, John Jones, and Salisbury were waiting in the office. With the exception of Salisbury, these men were all officials of Petitioner. Tom MacNamara asked Anderson if he had signed an authorization card. When the answer was "yes", MacNamara expressed disappointment especially since Anderson had not spoken with him about it before signing. In testimony before the Trial Examiner, Anderson related his conversation with MacNamara as follows:

"Anderson: 'I told him yes, I did.' And he said, 'I wish you had come and talked to me first.' I said, 'Well, they said everybody else had signed the card except Kike Salisbury and I were the only ones who hadn't signed it,' and I said 'It makes no difference to me. I have been in unions all of the time, and I might as well join the union again.' That it didn't make any difference to me, and so I joined[3] I signed the card. And Tom showed me a list—no, I take that back. Tom didn't. John showed me a list. That Kike Salisbury,—Clifton Salisbury and myself—were the first two that had signed.' And I said, 'Well, what the heck. They told me that we were the last two to sign.' I said, 'In that case I will just write a letter and tell them to cancel me out. I want to withdraw.' And Mr. McNamara—Glenn McNamara—he spoke up and said, 'Will you give me a copy of that letter?', and I said, 'I sure would.' And so I wrote a letter to the company, and I give Glenn a copy, the union a copy, and I kept a copy."

It is undisputed that representations were made to Salisbury and Anderson that they were the last to sign. It is also undisputed that Salisbury and Anderson were in fact the first to sign.

The Trial Examiner found that their authorization cards were "*void ab initio*" due to their reliance on the substantial and critical misrepresentations made by the Union. Therefore, since a majority did not exist at the time of the presentation, the Petitioner did not have to bargain. However, the Board modified this section of the finding stating that "statements [misrepresentations] of this type are immaterial in determining the validity of authorization cards, even when signed in reliance thereon." The National Labor Relations Board characterized the representations as mere puffing.

The question before this Court is whether the statements made by the Union organizer coupled with the testimony of Anderson would invalidate *ab initio*, the authorization cards of Salisbury and Anderson.

The cases most often brought before this Court have dealt with dual purpose authorization cards and misrepresentations as to which purpose the cards were to be used. Pizza Products Corporation v. N. L. R. B., 369 F.2d 431 (6th Cir. 1966); N. L. R. B. v. Cumberland Shoe Corp., 351 F.2d 917 (6th Cir. 1965). Here though the question is two fold: 1) whether the Union claim of having signed everyone else was merely puffing, or a material misrepresentation and 2) if it was a material misrepresentation, was their reliance such as to prevent a freedom of choice?

■ This Court is of the opinion that the statements made by Petitioner should be on behalf of union were in fact misrepresentations and not puffing. The statements were false and meant to mislead the two employees. N. L. R. B. v. Delight Bakery, Inc., 353 F.2d 344 (6th Cir. 1965), N. L. R. B. v. Cumberland Shoe Corp., 351 F.2d 917 (6th Cir. 1965); see Pizza Products Corporation v. N. L. R. B., 369 F.2d 431 (6th Cir. 1966).

We now consider whether the misrepresentations were misleading to the degree of impairing a freedom of choice.

3. It is well to note the emphasis Anderson placed on the fact that it did not make any difference to him so he joined.

We are not dealing with naive or uneducated workers in this case. Here Salisbury and Anderson were former union members.[4] They were fully cognizant of what methods are used by the union in organizing. We believe that the record as a whole substantiates a freedom of choice, and further that Salisbury and Anderson would have signed the authorization cards regardless of the misrepresentations. Home Pride Provisions, Inc., 161 N.L.R.B. 47 (1966). This is evidenced by the testimony of Anderson, hereinabove referred to, before the Trial Examiner.

■ We have concluded that there is substantial evidence to support the findings of the Board that the six authorization cards presented by the Union were valid. Atlas Engine Works, Inc. v. N. L. R. B., 396 F.2d 775 (6th Cir. 1968); N. L. R. B. v. Swan Super Cleaners, Inc., 384 F.2d 609 (6th Cir. 1967). Since the Union did present a majority of valid cards, this Court will now consider whether Petitioner's refusal to bargain was in good faith. Cf. Dayco Corporation v. N. L. R. B., 382 F.2d 577 (6th Cir. 1967).

We must determine whether the refusal to bargain was based on good faith doubt or was a tactical play to gain time in order to dissipate the majority status.

■ It is true that violations of Section 8(a) (1) of the Act occurring during a union organizational campaign standing alone may not be sufficient to negate a good faith doubt on the part of management. Peoples Service Drug Store, Inc. v. N. L. R. B., 375 F.2d 551 (6th Cir. 1967). However, where the employer's unfair labor practices are clearly established after the bargaining demand is made, the violations may indicate that the Petitioner's assertions of good faith doubt are spurious. N. L. R. B. v. Ben Duthler, Inc., 395 F.2d 28 (6th Cir. 1968), N. L. R. B. v. Cumberland Shoe Corp., 351 F.2d 917 (6th Cir.

1965), N. L. R. B. v. Austin Powder Co., 350 F.2d 973 (6th Cir. 1965).

■ The record is replete with evidence supporting the Board's finding that the General Counsel successfully met the burden of proving Petitioner's bad faith. Lane Drug Co. v. N. L. R. B., 391 F.2d 812 (6th Cir. 1968), cert. denied 393 U.S. 837, 89 S.Ct. 114, 21 L. Ed.2d 108 (Oct. 15, 1968) (No. 233). See Pizza Products Corp. v. N. L. R. B., 369 F.2d 431 (6th Cir. 1966), N. L. R. B. v. Power Equipment Co., 313 F.2d 438 (6th Cir. 1963). This Court is in full agreement with the Trial Examiner's partial summation of the Section 8(a) (1) violations of the Act wherein he states:

"The widespread unlawful interrogation, and the specific unlawful coercive pressure put on four of the mechanics to induce them to withdraw their union authorization strongly negates the claim that Respondent had any bona fide doubt about the Union's majority status on and after January 3, and as strongly supports the conclusion that Respondent acted promptly after the Union demand to dissipate the majority status indicated by its cards."

The activities referred to above occurred after the presentation of signed authorization cards and were designed to undermine the majority status of the Union. N. L. R. B. v. Cumberland Shoe Corp., 351 F.2d 917 (6th Cir. 1965); Skyline Homes Inc. v. N. L. R. B., 323 F.2d 642 (5th Cir. 1963), cf. N. L. R. B. v. Cactus Petroleum, Inc., 355 F.2d 755 (5th Cir. 1966). Instead of questioning the claim of majority status when the cards were first presented, the Petitioner embarked on a campaign to reduce the majority.

We find that the final order of the Board is supported by substantial evidence. Atlas Engine Works, Inc. v. N. L. R. B., 396 F.2d 775 (6th Cir.

---

4. Salisbury had been a member of Teamsters locals for over 12 years. Anderson had been a member of the Machinists Union about five years and had a withdrawal card for three years.

1968), N. L. R. B. v. Cumberland Shoe Corp., 351 F.2d 917 (6th Cir. 1965).

Petitioner's petition to set aside the order of the Board is denied and the cross-petition for enforcement is hereby granted.

McALLISTER, Senior Circuit Judge (dissenting).

This entire case rests upon the validity of the authorization cards signed by Anderson and Salisbury. If these cards were invalid, the union would not have had a majority of the employees.

The trial examiner found that the officials of the union represented to Anderson and Salisbury that all of the employees of the mechanics' union, except themselves, had signed cards authorizing the union to act as bargaining agent. The fact was that a majority had not signed the cards and, without the signed authorizations of Anderson and Salisbury, the union would not have had a majority of employees authorizing it to act as their bargaining agent. As a matter of fact, no one had signed the cards before Anderson and Salisbury were induced by fraudulent misrepresentations to sign.

The trial examiner found that the authorization cards signed by Anderson and Salisbury were void ab initio, due to the reliance of such employees on the substantial and critical misrepresentations made by the union. However, the Board, upon review, reversed this particular holding, stating that such misrepresentations were mere puffing.

In the prevailing opinion of this court, it is held that the statements made by the union were *not* puffing, but were false and meant to mislead Anderson and Salisbury into believing that a majority of the employees had already signed with the union. It is also held in the prevailing opinion that, while the representations were false and meant to mislead the two employees, their freedom of choice was not impaired.

But when we find false and fraudulent representations were made with the defi-

nite purpose of misleading the two men, who signed the authorization cards because of such fraudulent representations, how do we know that they would have signed in any event, as found by the Board, whose decision, on this point, the majority opinion affirms?

The trial examiner found that Anderson and Salisbury signed the authorization cards upon the misrepresentations of the union officials, and that the *efficient* cause of the signing of the cards "was the flat misrepresentation that the union already had majority status." I feel that the hearing examiner's findings should be sustained as against the conclusions of the Board. It would appear to me to be unjustifiable to set aside these findings of the hearing examiner, who heard the witnesses, on the ground that the "freedom of choice" of Anderson and Salisbury was not impaired, although this was not the excuse given by the Board that caused it to disregard the findings of the trial examiner.

After Anderson's testimony quoted in the accompanying opinion, when Anderson learned that he was not one of the last to join the union as the union represented and, therefore, wanted to cancel his authorization card, he further frankly testified that he said to another employee, "there was going to be a union some day * * * I will join the union. * * * It's going to be union all over the country. I know it's going to be that way some day." But, as soon as he heard of the false representations, he wrote the union stating that "at this time" he didn't want to join and would like to have his application card back.

Salisbury testified that when he learned the union had falsely told him that everybody else in the group had signed and that he and Anderson were the last two, whereas no one had signed before him and Anderson, it made him mad and he felt he had been used to secure authorization cards from the rest of the mechanics; and he forthwith wrote to the union asking them to return his authorization card.

It is true that Anderson and Salisbury were former union members; but I do not feel that it can be said that, as former union members, they were fully cognizant that false and fraudulent representations were methods used by the union in organizing, and we should not be asked to consider that such methods customarily, or frequently, constitute the modus operandi of a union in organizing. Without the authorization cards of Anderson and Salisbury, the union would not have been the representative of the employees in question at the time the alleged unfair labor methods were indulged in, and there would have been no case against petitioners.

In accordance with the foregoing, it is my view that the petition to set aside the order of the Board should be granted and the cross-petition for enforcement should be denied.