**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**RONEY PLAZA APARTMENTS, Respondent.**

**No. 77–3481.**

United States Court of Appeals, Fifth Circuit.

July 2, 1979.

Elliott Moore, Deputy Assoc., Gen. Counsel, Lawrence Blatnik, Elinor Stillman, N.L. R.B., Washington, D. C., for petitioner.

Hogg, Allen, Ryce & Norton, Jesse S. Hogg, Robert L. Norton, Coral Gables, Fla., for respondent.

Before BROWN, Chief Judge, GODBOLD and FAY, Circuit Judges.

GODBOLD, Circuit Judge:

The Board seeks enforcement of its order that Roney Plaza Apartments, a hotel and apartment operation at Miami Beach, Florida, cease and desist from unfair labor practices and recognize the union[1] as exclusive bargaining representative of its porters and

1. Local 355 of the Hotel, Motel, Restaurant, Highrise Employees and Bartenders Union, AFL–CIO.

maintenance and housekeeping employees. Several of these employees began a campaign to unionize in August 1976. The Board's order is based upon events between that time and a representation election on November 5, which the union lost 21 votes to 13. We enforce the order as to the Board's findings of unfair practices. We deny enforcement of a *Gissel*[2]-type bargaining order.

### I. The background

Roney management made no secret of its opposition to the union, and made several attempts to convince its workers not to support it. After a petition for a representation election was filed August 25, general manager Herman called a meeting and informed the employees that Roney did not want a union and would oppose it by all legal means. He also held a meeting of all supervisors at which Roney's labor counsel explained what they could legally say or do in their dealings with the employees. Another general meeting was held September 15 at which Roney's labor counsel and Herman again urged the employees not to vote for the union. Their remarks were translated into Spanish by Herman's assistant, Sergio Descalzo. Although these meetings evidenced opposition to the union, employees were not compelled to attend, and the Board did not find them to be unfair practices.

Herman hired Enrique Garcia, a law student and former Cuban lawyer and judge, to talk with individual employees in Spanish about the union. Garcia said that he spoke to most of the Spanish-speaking employees, about 20. While the ALJ rejected the General Counsel's contention that Garcia's activities amounted to systematic coercive interrogation, he found that in two incidents Garcia illegally interrogated employees. There was substantial evidence that Garcia questioned Jose Vigoa and Sophia Caraballa shortly before the election about how they intended to vote and why.

We have identified eight factors to be considered in determining the coercive tendency of employer interrogation:

> (1) the history of the Company's attitude toward its employees; (2) the type of information sought or related; (3) the rank of the Company official in the Company hierarchy; (4) the place and manner of the conversations; (5) the truthfulness of employees' responses; (6) whether the Company has a valid purpose in obtaining information; (7) if so, whether this purpose is communicated to employees; and (8) whether the Company assures employees that no reprisals will be taken if they support the Union.

*Sturgis Newport Business Forms, Inc. v. NLRB,* 563 F.2d 1252, 1256 (CA5, 1977). *See NLRB v. Varo, Inc.,* 425 F.2d 293, 298 (CA5, 1970); *NLRB v. Camco, Inc.,* 340 F.2d 803, 804 (CA5), *cert. denied,* 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339 (1965). Garcia's questioning of Vigoa and Caraballa meets most of these criteria. Garcia was acting as a special assistant to the general manager, specifically hired to aid management's avowed opposition to the union. While the interviews may not have been conducted in an atmosphere of "unnatural formality," *Camco, supra* at 804, they were contrived in nature[3] and both Caraballa and Vigoa were directed by their supervisors to attend. No explanation was given for the interviews. The employer's primary response rests upon credibility grounds, and we reject it.

### II. Restrictions on solicitation

The Board found that Herman promulgated and enforced an invalid no-solicitation rule. The employer insists that no rule was promulgated but rather that in isolated incidents it took justifiable action against union solicitation, limited to the participants therein. Both parties are overly insistent upon semantics. The ultimate ques-

---

**2.** *NLRB v. Gissell Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

**3.** Garcia's three conversations with Caraballa, for example, ranged over topics including reli-gion and similarities between Cuban and Colombian Spanish, along with questions and advice about the union.

tion is whether the employer's actions, whether or not cast into a rule, interfered with the organizational rights of employees under the Act.

Prior to the organizational campaign the employer had no clearly discernible rule or policy against solicitation. Herman testified that employees could discuss any subject on the job without any attempt by the employer to curtail discussion if it did not interfere with work. He explained that the company was normally "loose" about such matters but that he would occasionally "prod" employees when talk about any subject substantially interfered with work.

The leaders of the organization effort were Suarez, Velasquez, and Vigoa. After organization began but before September 7, several supervisors reported to Herman that Suarez, the most active organizer, was interfering with the work of others by soliciting for and discussing the union while they were working. Herman asked counsel what he should do and was advised to do nothing as the situation might "clear up" by itself. On September 6 Suarez interfered—minimally the Board found—with the work of a maid. Her supervisor protested, and a mini-confrontation occurred between Suarez and the supervisor. Herman, in English, reprimanded Suarez, told him not to talk to employees while they were working, although he could do as he wished during lunch and break times, and warned Suarez that he could be fired if he failed to comply. Suarez became belligerent and intimated that he did not understand, although he had often conversed with Herman in English. Herman had a translator restate in Spanish what he had said to make sure that Suarez understood.[4]

Around September 7, Herman told union adherent Velasquez that he should not engage in union propaganda during working hours but could do so during lunch or breaks.

About a week later Suarez, Velasquez and another employee entered the elevator with a maid, and Suarez and Velasquez tried to get her to sign a union card. In fact she had already signed a card.[5] The maid was frightened and "tired of having [Suarez] harassing me about the union." She complained to her supervisor. Herman then talked to Suarez who denied the incident. (Suarez's testimony that he was not even present in the elevator was rejected by the Board.) Suarez's attitude was belligerent and evasive. When he denied the incident Herman fired him.

■■■ Reasonable restrictions upon solicitation are not *per se* invalid because imposed during an organizational campaign. The Act does not require an employer to anticipate all problems and provide for them by written rule. *NLRB v. Avondale Mills,* 242 F.2d 669, 671 (CA5, 1957), *aff'd sub nom. NLRB v. United Steelworkers of America,* 357 U.S. 357, 78 S.Ct. 1268, 2 L.Ed.2d 1383 (1958). A new rule or a tighter enforcement policy will, however, be invalid if imposed with discriminatory intent. *William L. Bonnell Co. v. NLRB,* 405 F.2d 593 (CA5, 1969). Herman admitted that his discussions with Suarez after the two incidents with the maids were the first times there had ever been substantial enforcement of a policy against talk that interfered with work. Initial promulgation of a no-solicitation policy upon the commencement of a union organizational campaign is strong evidence of discriminatory intent. *NLRB v. Mangurian's, Inc.,* 566 F.2d 463, 465 (CA5, 1978); *Brewton Fashions, Inc. v. NLRB,* 361 F.2d 8, 17 (CA5), *cert. denied,* 385 U.S. 842, 87 S.Ct. 95, 17 L.Ed.2d 75 (1966). The employer may, of course, demonstrate that imposition of the restrictions was justified because the union campaign brought about substantial work disruption in a plant for the first time. *Permian Corp.,* 189 N.L.R.B. 860 (1971); *TRW, Inc. v. NLRB,* 393 F.2d 771, 773 (CA6 1968). The Board considered that the interference

---

4. Herman's testimony was credited. The Board found Suarez to be a "most unreliable witness."

5. Which the Board later found was invalid because she had signed it pursuant to what the Board found to be job threats by Suarez.

with work by the incidents involving Suarez was minor, and we cannot disagree. It was not demonstrated that the warning to Velasquez on September 7 was brought about by any interference with work. Herman did testify to receiving reports, before September 7, of Suarez's interfering with work by solicitation, but we cannot merely assume that these interferences, if they occurred at all, were substantial.

We must also give consideration to the fact that the employer, while forbidding pro-union interferences with work permitted anti-union activities—the meetings called by Herman and the interviews by Garcia—that interfered with work.[6]

Also, in considering the no-solicitation policy we must note the restriction on access, discussed in III, below, which was identified by the supervisor involved as a new "rule" promulgated at a management meeting.

We conclude that the Board's finding of discriminatory restraints on solicitation is supported by substantial evidence and must be enforced.

### III. Restriction on access

■ The Board found that the employer had promulgated and enforced an invalid no-access rule, barring employees from the premises after working hours. This finding was based on an incident in which union adherent Vigoa was told by supervisor Mendez to leave the premises. After work Vigoa was getting a haircut at the Roney Plaza barber shop. Mendez told him that he had gotten word from the management that employees would not be allowed to remain on the premises after 4:30 p.m. He further indicated that this new rule had been decided upon at a management meet-

ing that had included Roney's labor counsel. Mendez told Vigoa that he must leave after the haircut, and waited until Vigoa was finished.

■ Even the nondiscriminatory prohibition of solicitation after working hours violates § 8(a)(1), absent a showing that production or discipline requires it. *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 803, 65 S.Ct. 982, 987, 89 L.Ed. 1372, 1379 (1945); *NLRB v. Mangurian's, Inc., supra*, 566 F.2d at 465; *NLRB v. Mid-States Metal Products, Inc.*, 403 F.2d 702, 704 (CA5, 1968). We have also held that rules simply prohibiting employees from being on the premises at all after work hours are similarly presumed invalid. *Republic Aluminum Co. v. NLRB*, 394 F.2d 405 (CA5, 1968) (en banc). There is, moreover, no need to show that such a rule actually interferes with union organization or that the union requires after-hours access to communicate successfully. *Id.*[7]

Still, there must be some substantial basis for the finding that the incident interfered with the workers' organizational rights in violation of § 8(a)(1). Mendez's remarks were not explicitly aimed at union activity, but their timing, their content, and the fact that they were aimed at a leading union adherent, raise strong suspicions. There is no apparent reason for a rule prohibiting Roney's employees from remaining on the premises after hours to use public facilities such as the barber shop. The employer made no attempt to offer justification for this action, and did not call Mendez to offer an explanation of his reasons. We enforce the Board's order with respect to this issue.

### IV. The discharge of Suarez

■ The primary justifications for Suarez's discharge were his interruptions of the

---

**6.** The employer is entitled to make its views on unionization known, 29 U.S.C. § 158(c), and employee interviews, themselves coercive, will not of themselves necessarily convert an otherwise valid solicitation rule into an unfair practice. *NLRB v. Avondale Mills, supra.* Here, the Board is correct that Roney's unfair practice interviews may be considered along with other evidence tending to show discrimination. *Ridgewood Management Co. v. NLRB*, 410 F.2d 738, 740 (CA5), *cert. denied*, 396 U.S. 832, 90

S.Ct. 87, 4 L.Ed.2d 83 (1969); *NLRB v. Electro Plastic Fabrics, Inc.*, 381 F.2d 374, 376 (CA4, 1967).

**7.** The courts of appeals are not in agreement on this point, but we appear to be in the majority. *See Diamond Shamrock Co. v. NLRB*, 443 F.2d 52, 60, n.27 (CA3, 1971); Anno., Forbidding Access to Employer's Property as Unfair Labor Practice, 26 A.L.R.Fed. 153, 173–74 (1976).

work of others and his insubordination in continuing to engage in at-work solicitation. Both reasons are removed by our conclusion that substantial evidence supports the Board's finding of an invalid no solicitation policy. Suarez was belligerent and evasive when questioned by Herman, and Herman fired him after he falsely denied the elevator incident, but all of this is inextricably involved with Herman's interrogation and orders concerning Suarez's engaging in protected activity; it cannot stand as a dominant motive overshadowing the employer's anti-union activity out of which the questioning, and Suarez's responses, arose. The Board's finding of discriminatory discharge must stand.

## V. The bargaining order

The Board ordered Roney to bargain with the union despite its loss in the representation election, under the doctrine of *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). We decline to enforce the *Gissel* order, however, because of union misrepresentation in securing a card majority. We find that because of that misrepresentation the cards lack value as indicators of employee sentiment and that the union therefore lacks the valid card majority necessary for a *Gissel* order.[8]

The Board contends that any inquiry into the circumstances surrounding the card solicitation is barred by *Gissel,* based on that case's rejection of "any rule that requires a probe of an employee's subjective motivations as involving an endless and unreliable inquiry." 395 U.S. at 608, 89 S.Ct. at 1937, 23 L.Ed.2d at 575. But the discussion in *Gissel* of the issues of employee motivation and union misrepresentation was concerned only with the problem of whether cards were signed for the purpose of authorizing union representation or merely to obtain an election. 395 U.S. at 584, 604–06, 89 S.Ct. at 1924, 1935–36, 23 L.Ed.2d at 561, 572–74. The teaching of this portion of *Gissel* relates to the employee's *purpose* in signing, and that *purpose* is presumed to be authorization of the union to represent him if the card so states unambiguously and if no one has explicitly represented to him that the card has a different purpose.

*Gissel* does not dispose of the case at hand, however, because "*Gissel* does not deal with misrepresentations regarding matters other than the purpose of the card." *NLRB v. Boyer Brothers, Inc.,* 448 F.2d 555, 562 (CA3, 1971), *cert. denied,* 409 U.S. 878, 93 S.Ct. 132, 34 L.Ed.2d 132 (1972). Signatures obtained by duress are not protected from attack by *Gissel. Id.* Thus, misrepresentation that a majority of employees has signed is fatal if it was a means of coercing employees through fear of majority reprisal. *Local 153, ILGWU v. NLRB,* 143 U.S.App.D.C. 252, 254, 443 F.2d 667, 669 (1970), *cert. denied,* 403 U.S. 905, 91 S.Ct. 2206, 29 L.Ed.2d 681 (1971); *Amalgamated Clothing Workers of America v. NLRB,* 124 U.S.App.D.C. 365, 365 F.2d 898, 908 (1966). Moreover, cards obtained by economic inducements are invalid. *NLRB v. Savair Mfg. Co.,* 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973).[9] Our problem

---

**8.** Another necessary condition for a *Gissel* order is that the employer has committed "serious and extensive" unfair labor practices that have made a fair election unlikely. *Bandag, Inc. v. NLRB,* 583 F.2d 765, 770–71 (CA5, 1978); *NLRB v. American Cable Systems, Inc.,* 414 F.2d 661, 668–69 (CA5, 1969), *cert. denied,* 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970). Since we find that the union lacks a card majority we need not decide whether Roney's unfair practices are serious enough to justify a bargaining order.

**9.** In *Savair* the union offered to waive its initiation fee for employees who would sign cards before the election. The Supreme Court found this to be an improper economic inducement that constituted "buy[ing] endorsements." 414 U.S. at 277, 94 S.Ct. at 498, 38 L.Ed.2d at 502. The issue in *Savair* was not the validity of the cards themselves but the somewhat more attenuated effect of the improper card solicitation on the election. However, the Court's argument relies in part on the possibility that the improperly solicited cards could be used as the basis for a *Gissel* order. 414 U.S. at 279–80, 94 S.Ct. at 500–501, 38 L.Ed.2d at 503–04. The Court concluded that this possibility

> cautions us to treat the solicitation of authorization cards in exchange for consideration of fringe benefits granted by the union as a separate step protected by the same kind of

thus is not whether the card cuts off all inquiry into the circumstances surrounding its execution, for plainly it does not, but rather what are the limits of inquiry and what effect shall be given to what is found.

At least four other circuits have held that cards may be invalidated if they were solicited with misrepresentations that the union already had majority support. In *G & A Truck Line, Inc. v. NLRB*, 407 F.2d 120 (CA6, 1969), two employees were told that they were the last to sign authorization cards when in fact they were the first. *Id.* at 122. The Sixth Circuit rejected the Board's contention that such a statement was only puffing. The court found that the statements were material misrepresentations.[10] In *NLRB v. Rohtstein & Co.*, 266 F.2d 407, 409 (CA1, 1959), the First Circuit held that similar misrepresentations invalidated a card necessary for a majority, and therefore declined to enforce the Board's bargaining order. *Rohtstein* has been followed by the Seventh Circuit, *NLRB v. Dan Howard Mfg. Co.*, 390 F.2d 304, 308 (CA7, 1968); *Lake City Foundry Co. v. NLRB*, 432 F.2d 1162, 1172 (CA7, 1970), and the Second Circuit, *Schwarzenbach-Huber Co. v. NLRB*, 408 F.2d 236, 241 (CA2), *cert. denied*, 396 U.S. 960, 90 S.Ct. 436, 24 L.Ed.2d 425 (1969).

Although most of these cases were decided before *Gissel*, we believe their holdings are not superseded by it.[11] First, as mentioned above, *Gissel* was concerned with the issue of the employee's purpose in signing the card; these cases, like the present one, involved misrepresentations of fact that had the likely outcome of inducing employees to sign cards who would not otherwise have done so. Second, the inquiry into the employee's purpose in signing the card necessarily involves testimony concerning the employee's state of mind.[12] An inquiry into the gravity of a union misrepresentation such as the one at hand, however, will not rest exclusively on subjective evidence. While the experience or knowledgeability of the employees may be a factor,[13] the principal inquiry is whether the misrepresentations were so serious that unfair inducements can reasonably be expected to have flowed from them.

Such a conclusion is warranted in this case. The union adherents who solicited the cards planned from the outset to tell each employee being solicited that all of the others had already signed.[14] Consistent with this strategy, nearly all of the cards (25 of 29) were obtained on one day, so there was little chance that the deception would be discovered.[15] We therefore hold

---

moral standard that governs elections themselves.
*Id.*

**10.** The court went on to consider "whether the misrepresentations were misleading to the degree of impairing a freedom of choice." 407 F.2d at 122. The court concluded that they were not.

**11.** This conclusion is supported by the Seventh Circuit, which reaffirmed its adherence to this line of cases in *Lake City Foundry*, 432 F.2d at 1172.

**12.** The Court pointed out that direct testimony by the employee regarding his motivation in signing may be especially unreliable in *Gissel*-type cases, where serious unfair practices may have affected employee willingness to support the union openly. 395 U.S. at 608, 89 S.Ct. at 1937, 23 L.Ed.2d at 574–75.

**13.** In *G & A Truck Line* the court, in concluding that the misrepresentations did not affect employee free choice, relied on the employees' knowledge of union practices from previous

union membership and on the testimony of one employee. 407 F.2d at 123. In *Rohtstein*, the court relied in part on the employee's testimony that he signed because of the misrepresentation that a majority had already done so. 266 F.2d at 409.

**14.** There was ample evidence that this was the plan and that it was executed. One of the union adherents testified as to the plan, and 11 workers testified that they were solicited in this manner. The ALJ accepted all of this testimony in his findings of fact, and none of it is challenged by the Board.

**15.** The Board argues that *Gissel* discourages the use of any "probe of an employee's subjective motivations" because of the unreliability of such testimony. We agree, and that is why our decision is based not on the subjective testimony of solicited employees but on objective evidence of union misconduct and our evaluation of its seriousness.

The difficulties in dealing with such subjective testimony are evident from the ALJ's treat-

that because of the concerted plan of serious misrepresentation used here, the cards cannot be used as the basis of a *Gissel* order. Without regard to the validity of individual cards or the subjective motivations of individual employees, we find that the record does not support a finding "that employee sentiment can best be protected in the long run by issuing a bargaining order." *Bandag, Inc. v. NLRB, supra,* 583 F.2d at 773; *NLRB v. American Cable Systems, Inc., supra,* 414 F.2d at 668–69. Focusing on the overall misconduct of the union rather than on the individual cards is not a novel approach. In *Schwarzenbach-Huber Co. v. NLRB, supra,* the union sent a letter to management claiming a majority which it did not have. Copies of the letter were widely distributed to employees. The Second Circuit held this a sufficient misrepresentation to invalidate all cards signed after distribution of the letter:

> The intended effect of this widespread diffusion of the Union's false claim that it had a majority was undoubtedly to bring the reluctant sheep into the fold by telling them the fight was over, the Union had won and they might as well get on the bandwagon. No cards handed to the Union after the making of such a misrepresentation could possibly be deemed valid.

408 F.2d at 241.

Our conclusion that this sort of deception is a serious impediment to employee free choice is also supported by the Supreme Court's opinion in *NLRB v. Savair Mfg. Co., supra.* In *Savair* cards were invalidated because they were obtained by economic inducement. While the case is therefore not directly controlling here, a major point in *Savair* did not have to do with economic inducements as such but with the effect of the "purchased" union cards as a misrepresentation of union support in the election campaign:

> By permitting the union to offer to waive an initiation fee for those employees signing a recognition slip prior to the election, the Board allows the union to buy endorsements and paint a false portrait of employee support during its election campaign.

414 U.S. at 277, 94 S.Ct. at 499, 38 L.Ed.2d at 502. This point is critical to the ultimate holding in *Savair,* and the Court evidently considers the impact of such misrepresentations significant.

The Board dismisses the misrepresentations here as "puffing," and relies on cases that have adopted that position.[16] But merely applying the palliative term "puffing" is not a principled basis for decision. Obviously, there may be a basis for disregarding some misstatements made by overzealous union adherents in the heat of an organizational effort, where overstatements can be expected. But it is not required that the Board, or the courts, give free rein to egregious and deceitful practices designed to have impact upon the minds of employ-

---

ment of it in this case. While disregarding the testimony of several employees that they had been told they were the last to sign, the ALJ invalidated the card of employee Dencas, because of his more explicit testimony that he did not like the union and signed only because of his desire not to be "the last one left behind." We find the distinction between Dencas and the other employees unpersuasive, and we doubt that such subjective testimony will often provide a reliable basis for decision.

16. Two circuits appear to have agreed with the Board that misrepresentations concerning union strength will not invalidate cards. The first such case was *Amalgamated Clothing Workers of America v. NLRB,* 124 U.S.App.D.C. 365, 365 F.2d 898 (1966). There the D.C. Circuit held that "puffing does not vitiate the cards unless the comments were a means of coercing

employees to sign cards out of fear of majority reprisal." *Id.* 124 U.S.App.D.C. at 375, 365 F.2d at 908. Curiously the court cites *Rohtstein, supra,* in support of this assertion despite its contrary holding. *Id.* n.21. *Amalgamated Clothing Workers* was followed in *Local 153, ILGWU v. NLRB,* 143 U.S.App.D.C. 252, 254, 443 F.2d 667, 669 (1970), *cert. denied,* 403 U.S. 905, 91 S.Ct. 2206, 29 L.Ed.2d 681 (1971), *enf'g Marie Phillips, Inc.,* 178 N.L.R.B. 340 (1969). These two cases were followed in *NLRB v. Boyer Brothers, Inc.,* 448 F.2d 555, 562 (CA3, 1971), *cert. denied,* 409 U.S. 878, 93 S.Ct. 132, 34 L.Ed.2d 132 (1972). We prefer the approach taken by the First Second, Sixth and Seventh circuits. *Rohtstein, supra; Schwarzenbach-Huber Co., supra; G & A Truck Line, Inc., supra; Dan Howard Mfg. Co., supra.*

ees choosing whether or not to authorize union representation. Protecting the organizational rights of workers does not require such an extreme position.

Where cards are the basis for an election, employees can secretly record a preference by ballot, despite misstatements by union, employer, or both. But in a *Gissel* case the cards are the basis for a duty to bargain, imposed by operation of law on the predicate that they truly represent the desire of employees for union representation and that this desire cannot be fairly effectuated through an election. Thus, misrepresentation carries an especially high impact.

Enforcement is GRANTED in part and DENIED in part.