MASSEY STORES, INC., d/b/a Kermit
Super Valu, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 79–1638.

United States Court of Appeals,
Fourth Circuit.

Argued June 2, 1980.

Decided Oct. 2, 1980.

A. W. VanderMeer, Jr., Richmond, Va.
(Paul M. Thompson, Hunton & Williams,
Richmond, Va., on brief), for petitioner.

Penny Pilzer, N. L. R. B., Washington, D.
C. (William A. Lubbers, Gen. Counsel, John
E. Higgins, Jr., Deputy Gen. Counsel, Rob-
ert E. Allen, Acting Associate Gen. Counsel,
Elliott Moore, Deputy Associate Gen. Coun-
sel, Janet C. McCaa, N. L. R. B., Wash-
ington, D. C., on brief), for respondent.

Before WINTER and BUTZNER, Circuit
Judges, and WALTER E. HOFFMAN, Sen-
ior United States District Judge for the
Eastern District of Virginia, sitting by des-
ignation.

BUTZNER, Circuit Judge:

Massey Stores, Inc., petitions for review,
and the National Labor Relations Board

petitions for enforcement, of an order of the Board reported at 245 NLRB 139 (1979). The Board found that the company had violated § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), by coercively interrogating employees about the activities of Local 347, Food Store Employees' Union, by threatening employees with discharge and other job–related disadvantages for engaging in union activity, by creating the impression of surveillance of employee union activities, and by soliciting employees to engage in surveillance. The company does not seek review of these 8(a)(1) violations. The Board also found that the company had violated §§ 8(a)(3) and (1) of the Act by reducing an employee's working hours and by calling in an employee's loan because they had engaged in union activities. It also found that the company had violated §§ 8(a)(5) and (1) of the Act by refusing the union's demand for recognition, based on authorization cards, as the exclusive representative of the employees in the company's Kermit, West Virginia, store. Finding that the company's illegal conduct had made a fair election improbable, the Board entered a bargaining order. We enforce all provisions of the Board's order except the bargaining order, which we decline to enforce because the Board did not establish that the union validly represented a majority of the company's employees.

## I

The complaint alleged that the store manager discriminatorily had reduced the working hours of three employees because of their union activities. Although the Board concluded that the evidence was insufficient to substantiate two of these incidents, it held that the manager discriminatorily had reduced Bonnie K. Stacy's working hours during the weeks ending March 11, March 25, and April 1, 1978.

Stacy was a part–time cashier. At her 1977 job interview with the store manager and the vice–president of the company, the manager told her that there was no need for a union, "that the union men had already said that they would be down to the store to organize it," and that "if I seen a union man walk into the store, to get to him as quick as possible." In January, 1978, the manager coercively interrogated Stacy.

Stacy signed a union authorization card on February 18, 1978. She first complained to the manager about a reduction in her hours on February 25. She told the manager that she had heard from an employee that the manager had found out that she had signed a union card. The manager asked her if she had signed, and she replied that she had not. At first the manager denied that he knew that her hours had been cut. When Stacy showed him the work schedule, he said that it was a misunderstanding and that her hours would be raised. The next week they were raised.

On March 5, after a union meeting, Stacy complained to the manager that he had cut her store hours again. The manager replied that he had found out that she had signed a union card. She asked him if the cashiers were ever going to get on full time. The manager replied that they had all turned against him, and as long as he was manager of that store he would not put a cashier on full time. He added that he would go into the street and hire a girl before he would put a cashier on full time.

The manager then said he had heard about talk of a strike. He went over the list of employees, pointing out those he thought would go on strike and those that would not. When he asked Stacy if she wanted to strike, she replied that she didn't. He then asked her to arrange a meeting with the employees of the store to conduct a secret vote to determine whether they wanted to strike. Stacy did not set up this meeting because she learned that it was against the law.

Later in the month Stacy participated in a short strike. She worked the day after the strike, and the assistant manager told her to come back the next day. When she returned, the manager told her that he had already scheduled somebody to work in her place. She resumed work at regular hours later in April.

The company's payroll records corroborate Stacy's testimony that her hours were reduced. The manager had left the company, and he was not called as a witness to rebut Stacy's testimony. Instead, the company relied on the testimony of its vice–president who said he had ordered a general reduction of hours because the store was running below its budgeted sales per man–hour. He acknowledged, however, that he allowed the manager to select the employees whose hours would be cut.

The administrative law judge credited Stacy's testimony. We find nothing in the record that would justify setting aside this finding of credibility. See *Dubin–Haskell Lining Corp. v. NLRB*, 386 F.2d 306, 308 (4th Cir. 1967). Accordingly, we conclude that those provisions of the Board's order dealing with this incident are supported by substantial evidence.

## II

In January, 1978, the manager lent an employee, Anthony Sartin, $300 of company money to make a down–payment on a truck. Sartin agreed to pay off the loan at the rate of $20 a week. On February 22, 1978, Sartin signed a union authorization card. Twice during that month the manager coercively interrogated Sartin and threatened to fire anyone who signed a card. He also told another employee that he knew Sartin had signed a card. He told this employee that people who signed a union card were "going to go down the tubes, either directly or indirectly." In March the manager complained to another employee that he had loaned three employees, including Sartin, "money to finance their cars and their trucks–what do they do–they go against me and sign a union card .... I ought to fire every damn one of them."

Sartin made the weekly $20 payments as agreed. When he was on the picket line in March he asked the manager for his paycheck. The manager refused to give him the check and told him he had to pay the loan in full. Sartin offered to pay cash. The manager refused and required him to sign over his check. When a union organizer intervened and asked the manager to allow Sartin to receive his check, the manager replied, "I loaned that little son–of–a–bitch money out of my pocket, and he turned against me."

In defense, the company relies on the vice–president's testimony that he directed the manager to collect the employee loans, discovered during an audit, because lending money to employees was against company policy. The company offered no other evidence to rebut the testimony of Sartin, the union organizer, and the two other employees who had testified to statements that the manager had made about Sartin. Nor did the company offer any explanation why an attempt to collect the loan was deferred until Sartin appeared on the picket line.

The administrative law judge did not credit the vice–president's testimony attributing the manager's conduct to non–discriminatory factors. Adopting the administrative law judge's findings, the Board concluded that the company required Sartin to repay the loan because of his activities on behalf of the union and that this conduct violated §§ 8(a)(3) and (1) of the Act. Again, we find no cause for rejecting the Board's credibility findings, and we enforce those provisions of the Board's order dealing with this violation.

## III

The Board found that the union had established by authorization cards that it represented a majority of employees when it requested recognition and bargaining; that the company's refusal of the union's demand was a violation of §§ 8(a)(5) and (1) of the Act; and that the company's threatening, coercive, and discriminatory conduct had undermined the union's majority and made a fair election improbable. Relying on *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Board entered a bargaining order.

The company does not dispute that a majority of the employees signed cards authorizing the union to represent them. It asserts, however, that the bargaining order

is inappropriate because the union obtained its majority through misrepresentations. It also contends that the facts do not satisfy *Gissel's* requirements for the imposition of a bargaining order.[1]

The company operates eight stores in Virginia and West Virginia. The union has been the bargaining representative at the Danville, West Virginia, store since 1968. In 1976, after an election and certification, the company and the union entered a bargaining agreement to cover the employees at a store in Point Pleasant, West Virginia. In 1977, the union and the company entered into a single contract covering the employees of both Danville and Point Pleasant in separate, storewide units. This contract took effect March 28, 1977, and continued through the pertinent incidents of this controversy. Article II of the Danville–Point Pleasant agreement provided that the union should be the sole and exclusive bargaining agent for all employees in the market "operated or which will be operated" by the company. Article III of this contract contained a union shop clause.

In late 1977, shortly before the store involved in this controversy was opened in Kermit, West Virginia, the union's president requested recognition as representative of the Kermit employees based on Article II of the Danville–Point Pleasant contract. The company refused recognition. The union then began an organizational drive to solicit authorization cards.

The union's organizer, who solicited all of the employees' signatures, told the employees to sign cards if they wished the union to represent them. He explained to the employees that there would be no election at the Kermit store and that, after a majority

of them had signed cards, the union would be recognized under the Danville–Point Pleasant contract. He also stated that once the union was recognized, employees at the Kermit store would be subject to the union shop provision in the Danville–Point Pleasant contract requiring all employees to join the union within 31 days of recognition.[2] Employee witnesses substantially corroborated the organizer's testimony. For example, one employee testified that the organizer told her that "if the store went union, and we did not sign a card, we wouldn't be employed there." The testimony of another employee discloses that the organizer explained that "if the union got in, that after the union got it, employees under that clause would have to join the union within 31 days."

On February 23, 1978, the union, claiming to represent a majority of the Kermit employees, requested recognition based on Article II of the Danville–Point Pleasant contract. On March 4, 1978, the company refused recognition and suggested that the union file a petition with the Board for an election. The union did not file, and the employees picketed the Kermit store for about 11 days. The company filed a petition for a representation election, which was dismissed because of the issuance of the complaint that led to these proceedings.

The Board did not decide whether Article II of the Danville–Point Pleasant contract was an "after acquired" clause that encompassed the Kermit store. Instead, the Board found that the organizer "was merely explaining the consequences of unionization resulting in a collective–bargaining agreement containing a union–security clause." It therefore concluded that the organizer's "statements did not invalidate any authorization cards."

---

1. In view of our decision, we find it unnecessary to discuss the company's second defense.

2. With reference to Article III of the Danville-Point Pleasant agreement, the union shop proviso, the union organizer testified:

Q. Did any employee ask if they had to belong to the union in order to work, at Kermit?
A. Yes. May I explain?
Q. Yes, sir.

A. On practically every one I talked to, their husbands, their brothers, their so forth, was there. Practically every one of them were coal miners, or worked under unions. And this is one of the main interests. And that came up on several occasions. Union shop—when your union gets in—will everybody belong to the union. And I explained Article 3 to one or two of them—"Yes, on the 31st day they will join." I discussed the union for an hour, hour and a half, in lots of cases.

In reaching this decision, the Board sustained the administrative law judge's ruling that an arbitrator's award was irrelevant and therefore inadmissible. The arbitrator found that Article II was never intended by the parties to extend recognition beyond Danville and Point Pleasant. Consequently, he ruled that Kermit was not an "after acquired" store within the meaning of that clause and held that the article did not require the company to recognize the union as bargaining agent for the Kermit store.

■■■ We believe the Board erred in sustaining the exclusion of this evidence. From the outset the company and union had differed over the question of whether the Kermit store was covered by the after acquired clause of the Danville–Point Pleasant contract. The dispute over the status of the Kermit store was therefore of primary importance to these proceedings. Ordinarily we would remand the case for the Board's consideration of this evidence, but because of the unusual circumstances that initiated the arbitration proceedings, we find it unnecessary to do so.

In litigation between the company and the union in the United States District Court for the Southern District of West Virginia, the parties, by an exchange of letters, agreed to arbitrate, in accordance with the arbitration clause in the Danville–Point Pleasant contract, whether that contract covered the employees at the Kermit store. .Pursuant to this agreement, the district court ordered "that the parties submit the dispute concerning the application and interpretation of Article II of their current collective bargaining agreement to arbitration upon the terms heretofore agreed to by their counsel." The arbitrator, as we have mentioned, ruled in favor of the company. There can be no doubt that the arbitrator's interpretation of the contract should be accepted in these proceedings. *See United Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *Beacon Photo Service, Inc.,* 163 NLRB 706 (1967).

■■ We believe that the Board's factual premise for upholding the validity of the authorization cards is not supported by substantial evidence. The organizer did much more than merely explain, in the language of the Board, "the consequences of unionization resulting in a collective–bargaining agreement contained a union–security clause." He represented to the employees that Article II of the Danville–Point Pleasant contract applied to the Kermit store, that if a majority signed cards no election would be required, and that under those circumstances they would be governed by the union shop clause of the Danville–Point Pleasant contract. This explanation misrepresented to the solicited employees the effect of their signatures.

*Heck's Inc.,* 172 NLRB 2231 (1968), *enforced sub nom. Food Store Employees' Union v. NLRB,* 433 F.2d 541 (D.C.Cir.1969), on which the Board relied, presents quite a different factual situation. There the union organizers "explained to [the employees] that once the Union obtained recognition it expected to obtain a contract which would require employees to join in 30 days." 172 NLRB at 2238. The Board held that this explanation did not invalidate the cards. Here, in contrast to the representations in *Heck's,* the organizer told the employees that the union shop clause was already in the contract that would govern their employment once a majority signed authorization cards.

Because the authorization cards were obtained by misrepresentations of material facts, we conclude that the union did not validly represent a majority of the employees at the time that it demanded recognition and bargaining. *Cf. NLRB v. Roney Plaza Apartments,* 597 F.2d 1046, 1051–54 (5th Cir. 1979); *Lake City Foundry Co. v. NLRB,* 432 F.2d 1162, 1172 (7th Cir. 1970); *The Schwarzenbach–Huber Co. v. NLRB,* 408 F.2d 236, 242–45 (2d Cir. 1969). The bargaining order therefore was inappropriate. Its enforcement would require the union and the company to bargain over the terms of a new contract. The union's majority, however, was obtained by misrepre-

sentations that the Danville–Point Pleasant contract would apply to the Kermit store if a majority of the employees signed authorization cards. Enforcement of the Board's order is granted in part and denied in part.